**BLUE CHIP ENTERPRISES, Chicago and North Western Transportation Company, and Hawkeye Land Company, Appellants,**

v.

**STATE Of IOWA DEPARTMENT OF NATURAL RESOURCES and State of Iowa Environmental Protection Commission, Appellees.**

No. 93–807.

Supreme Court of Iowa.

March 29, 1995.

Michael A. Smith of Lundy, Butler & Smith, P.C., Eldora, for appellant Blue Chip Enterprises.

James L. Pray of Gamble & Davis, Des Moines, for appellant Chicago and North Western Transp. Co.

Joe H. Harris, Cedar Rapids, for appellant Hawkeye Land Co.

Bonnie J. Campbell, Atty. Gen., and David R. Sheridan and David L. Dorff, Asst. Attys. Gen., for appellees.

Considered by HARRIS, P.J., and LARSON, CARTER, SNELL, and ANDREASEN, JJ.

CARTER, Justice.

This is an appeal from a ruling on judicial review of agency action by the Iowa Department of Natural Resources pursuant to Iowa Code section 17A.19 (1989). The district court's order affirmed a decision by an administrative law judge, which had been adopted as the final agency decision. The administrative law judge's decision upheld the validity of an agency order finding that appellants, Blue Chip Enterprises, Chicago and North Western Transportation Company, and Hawkeye Land Company, were responsible for contamination of soil and groundwater at the site described.

The administrative order required appellants to submit and implement a plan of investigation to determine the vertical and horizontal extent of soil and groundwater contamination at the site, and to submit and implement a remedial action plan to abate and eliminate the soil and groundwater contamination. Upon reviewing the record and considering the arguments presented, we modify to some extent, but otherwise affirm, the district court's order.

From approximately 1911 through March 28, 1980, the Chicago, Rock Island and Pacific Railroad Company (Rock Island) owned a railroad yard in Iowa Falls, Iowa. Throughout this period of time, diesel fuel and other petroleum products were spilled on the site in connection with Rock Island's operation of a fueling station. Soil in the railroad yard became saturated with diesel fuel. In 1975, Rock Island initiated federal bankruptcy proceedings but continued to operate the Iowa Falls site until March 28, 1980.

In January of 1980, a dog became saturated with diesel fuel standing in a ditch near Rock Island's fueling station. Its owner complained to the then Iowa Department of Environmental Quality (predecessor to appellee Iowa Department of Natural Resources (DNR)). The agency investigated the complaint and determined the source to be a surface spillage problem. Diesel fuel was found to be present in a nearby storm sewer outfall. Rock Island advised the agency that it would take remedial measures and proposed corrective actions that the agency deemed reasonable. The agency requested a timetable in which the corrective measures would be implemented.

Before any corrective measures were taken by Rock Island, appellant Chicago and North Western Transportation Company (CNW) was authorized to operate Rock Island's line through Iowa Falls. For some reason not explained in the record, Rock Island thereafter made no effort to follow through on its agreement to take corrective action with respect to the contamination created during the time it actively operated the Iowa Falls railroad facility.

CNW never owned the Iowa Falls site and did not inspect it prior to beginning its operations there, except to determine what facili-

ties it would be using. CNW's operation of the line through Iowa Falls commenced on March 28, 1980. CNW notified the federal bankruptcy trustee for Rock Island that it would not use an 8000–gallon underground diesel fuel storage tank, filled to near capacity at the time, or a partially filled 8000–gallon diesel fuel tank car located on the property.

On August 26, 1980, the Department of Environmental Quality issued an order requiring CNW to cease discharging diesel fuel and to submit a written plan of preventative measures within thirty days. CNW took no action to challenge this order within the time provided by law. In apparent compliance therewith, it dug approximately eight inches of dirt from the area around the fueling site and graded it. A twenty-four-inch sewer pipe was extended approximately 300 feet to the north, so that, if another spill occurred, the fuel would not flow into that pipe. After this cleanup effort was completed, CNW ceased to use this area for fueling.

In December of 1980, CNW reported that a derailment caused a spill of 2000 gallons of diesel fuel on the site north of and some 260 yards distant from the area previously used for refueling. All of this diesel fuel soaked into the soil. CNW did not investigate to determine if there was any adverse effect on the groundwater and undertook no cleanup effort in the area of the spill. The agency took no further action with respect to the Iowa Falls property from 1981 until November 1987, a circumstance that CNW attributes to an alleged settlement of the claims against it. During this period of time the federal bankruptcy court had approved the transfer of the Iowa Falls property from Rock Island to the Chicago Pacific Corporation on April 19, 1984, and from Chicago Pacific to appellant Hawkeye Land Company (Hawkeye) on July 1, 1985.

On November 18, 1987, the agency, now the DNR, received a complaint regarding the Iowa Falls railroad yard. A storm sewer that had been plugged was opened and diesel fuel ran out. Contaminants apparently had been leaching through the soil and into the sewer. An environmental specialist investigated the site for the DNR. In December 1987, he did a site inspection on the subject property now owned by Hawkeye. He observed diesel fuel in the underground storage tank and diesel fuel in the drainage ditch near the tile outfall. He collected water samples and submitted them for analysis. The test results confirmed that water pooled below the storm sewer outfall was contaminated with no. 2 diesel fuel. No activity involving fueling operations had been conducted on the site for at least five years.

Hawkeye removed the underground storage tank in December 1987. The tank was empty at that time. Hawkeye visually inspected the tank and found no leaks. It failed, however, to comply with the agency's regulations concerning procedures for removal of underground storage tanks. The DNR's environmental specialist again visited the site in April 1988. He observed a small amount of diesel fuel in a pooled area below the tile outfall and a very slight flow from the tile. He did not take samples but informed Hawkeye of the situation and directed that they clean up the storm sewer outfall. Hawkeye agreed to do this.

After being told the sewer outfall had been cleaned, the DNR's environmental specialist again visited the site. He took a sample from the pool of water below the tile outfall and again observed diesel fuel at that location and also observed a small trickle of diesel fuel in the storm sewer. At the hearing before the administrative law judge, a representative of Hawkeye conceded that it had not cleaned the storm sewer outfall as directed by the agency on April 6, 1988.

In 1988, Hawkeye executed a contract for sale of the site to appellant Blue Chip Enterprises (Blue Chip). Notice of the environmental problems was not given to Blue Chip until after the contract was executed. Blue Chip learned of these matters before the transaction was closed, however, and did not attempt to rescind the sale. In September 1988, Hawkeye deeded the site to Blue Chip, and Blue Chip took possession.

When Blue Chip took possession, there were three above-ground storage tanks on the site. Each contained diesel fuel. The tanks were inside the engine house and were

not leaking. Blue Chip used the fuel for about a month to run a bulldozer to clean up the property. The administrative law judge found that the primary cause of the contamination at the Iowa Falls site appeared to be fueling spills that had occurred during the time Rock Island operated the site. The administrative law judge also determined that CNW was guilty of actively polluting the site during its operation of Rock Island's line. Hawkeye was found to be an active polluter with respect to its removal of the underground storage tank and some leakage that occurred from the three above-ground storage tanks.

Although the administrative law judge found no active disposal of pollutants by Blue Chip, the judge determined that, legally, Blue Chip was a polluter by reason of the fact that it owned property from which diesel fuel was seeping into the groundwater. Based on these findings, all three appellants were held to be jointly and severally liable for submitting and implementing a plan of investigation to determine the extent of contamination and for implementing a remedial plan to abate and eliminate the soil and groundwater contamination. That order was upheld by the district court on a petition for judicial review pursuant to section 17A.19. We separately consider the arguments presented as to the liability of each appellant. Other facts that bear upon the issues to be decided will be referred to in our discussion of the legal issues by the parties.

### I. *Liability of Appellants for Cleanup Costs.*

We first consider an issue common to all three appellants. That issue is whether the language in Iowa Code section 455B.392 (1989) limits the liability for cleanup costs by a polluter to the extent of the hazardous condition caused by that person. Section 455B.392 is a statute directed at situations in which the state has incurred a cleanup expense and is attempting to recoup that expense from those persons responsible for the pollution. The statute reads:

A person having control over a hazardous substance is strictly liable to the state for all of the following:

*a.* The reasonable cleanup costs incurred by the state as a result of the failure of the person to clean up a hazardous substance involved in a hazardous condition *caused by that person.*

Iowa Code § 455B.392(1)(a) (emphasis added).

The agency urges that section 455B.392(1)(a) is not applicable in the present case because (1) it only applies to situations in which the state is seeking to recoup cleanup costs already incurred, and (2) it only affects agency action taken under Part 4 of Division IV of chapter 455B dealing with hazardous substances. It argues that its action in the present case is based upon section 455B.186 (located in Part 1 of Division III dealing with water quality) and thus subject to administrative sanctions specified in section 455B.175 without regard to any limitation found in section 455B.392(1)(a).

We are not persuaded that the language of section 455B.392(1)(a) does not set forth the legislative policy governing liability for cleanup costs regardless of whether the sanction is for recoupment or to compel payment of such costs in the first instance. It would seem unlikely that the legislature intended different policies to apply in the two situations. Diesel fuel is a "hazardous substance" as defined in section 455B.381(1), located in Part 4 of Division IV of the chapter. Hazardous conditions for which sanctions may be imposed under Part 4 include release or spillage of hazardous substances onto the land or into a water of the state. Iowa Code § 455B.381(2). These are the acts with which appellants are charged in the present case, and they fall within the subject matter to which section 455B.392(1)(a) applies.

We have previously recognized that, as a principle of statutory interpretation,

where legislation dealing with a particular subject consists of a system of related general provisions indicative of a settled policy, new enactments of a fragmentary nature on that subject are to be taken as intended to fit into the existing system and to be carried into effect conformably to it. . . .

*Daily Record Co. v. Armel*, 243 Iowa 913, 917, 54 N.W.2d 503, 506 (1952). Based on these considerations, we conclude that section 455B.392(1)(a) accurately reflects the policy of the state with respect to cleanup costs that may be imposed for the violations alleged in this case. The agency's order requiring implementation of a remedial action plan to abate and eliminate the soil and groundwater contamination must be limited to the extent of contamination caused by each appellant.

■ We are able in this opinion to make some determinations of causation, or lack thereof, as a matter of law. To the extent that we cannot do this, further proceedings before the agency will be required to determine the extent of cleanup cost liability. We do not share the view advanced by the agency that the nature of the injury precludes apportionment of harm to causes. As discussed in Restatement (Second) of Torts:

[I]f two defendants, independently operating the same plant, pollute a stream over successive periods, it is clear that each has caused a separate amount of harm, limited in time, and that neither has any responsibility for the harm caused by the other.

Restatement (Second) of Torts § 433A cmt. c (1965). The apportionment thus required does not depend on the ability to make exact determinations. Harm may be apportioned based on reasonable assumptions to be drawn from the number, type, and severity of the actions or instrumentalities that separately caused the harm. *Id.* cmts. b, d.

II. *CNW's Liability.*

■ A. *Claimed release of liability.* In considering the liability imposed on CNW, we first dispose of its claim that the agency released it from all liability as part of a negotiated agreement on or about December 4, 1980. The record reflects that at that time there were discussions between CNW and agency officials concerning remedial actions to be taken by CNW. Following these discussions, CNW scraped eight inches of soil from both the east and west sides of the track in the refueling area, regraded the area and filled it with rock. It also extended the tile in the ditch north of the area past the refueling area.

A memo from environmental specialist Larry Bell to an agency attorney dated January 13, 1981, states as follows:

I spoke with R.J. Christiansen of C & NW concerning their progress in dealing with the Iowa Falls problem. He indicated that they had [at this point memo describes remedial action previously discussed]. This action is part of the negotiated action agreed to on November 4, 1980. The railroad was supposed to write you to confirm their intended actions. Did you ever receive any such letter?

At the contested case hearing, the agency indicated that other parts of their file dealing with CNW's remedial action discussed in the Larry Bell memo were missing.

CNW was also unable to produce any documentation of the alleged settlement other than the Bell memorandum. While we believe that the administrative law judge could have found a settlement agreement based upon Bell's memo, the action taken by CNW, and the fact that the agency took no further action with respect to the Iowa Falls property for nearly six years, the agency was not compelled to so find. CNW bore the burden of proof on this issue. We have recognized that a party found to have presented insufficient proof of an issue on which it bears the burden must show on judicial review that a contrary result is demanded as a matter of law. *Ward v. Iowa Dep't of Transp.*, 304 N.W.2d 236, 238 (Iowa 1981).

■ B. *Whether CNW actively polluted the site during its operation of Rock Island's line.* The administrative law judge based the agency's finding of pollution by CNW on reports of diesel fuel spills in fueling operations and the report to the agency by CNW of the 2000–gallon spill in December 1980. Our review of the record suggests that substantial evidence supports that conclusion and that CNW was properly found to have been guilty of prohibited discharges under section 455B.186 based on those occurrences. It is thus subject to sanctions imposed under section 455B.175 subject to our prior determination concerning cleanup costs.

■ C. *Validity of emergency order.* CNW suggests that the initial order against it was promulgated as an emergency order under section 455B.388(1). It argues that no emergency was shown to exist. The district court disposed of this contention by concluding that, even if there was no basis for the emergency order, the sanctions imposed are now justified based upon the result of the contested case hearing in which CNW and the other appellants had a full opportunity to participate. We agree with that conclusion. Following the contested case adjudication of the agency's authority to impose sanctions, its authority to issue an emergency order ceased to be of significance in the proceeding. That is true as to all appellants.

■ D. *Apportionment of sanctions based on the extent of the prohibited discharge caused by each petitioner.* CNW contends that all sanctions imposed should be limited to the extent of the prohibited discharge caused by each petitioner. As a corollary to this contention, it argues that it is not responsible for that portion of the pollution caused by Rock Island. We agree with this contention with respect to the liability of the parties for cleanup costs. As we concluded earlier in this opinion, that liability only requires the violator to clean up hazards "caused by that person." Iowa Code § 455B.392(1)(a) (1991). This conclusion is not based on principles of comparative fault either common law or statutory. It is based on our conclusion that, under the applicable statutes, a violator is only required to clean up that portion of the hazardous condition caused by its own actions. This apportionment of harm to causes must consider the acts of entities that are not parties to the proceeding. Restatement § 433A cmt. a.

■ We do not agree with CNW's contention that the other sanctions imposed against it should be apportioned based on the extent of the total pollution caused respectively by each petitioner and by Rock Island. Each violator that has been found to have actively contributed to the pollution, including the type of passive pollution to the groundwater by Blue Chip, is individually subject to liability for submitting and implementing a plan of investigation to determine the extent of con-tamination. On the present record, the necessity of having a full investigation of all hazards as a result of causing some hazards is obvious. This circumstance supports the liabilities for submitting and implementing a plan of investigation that was imposed against CNW and Blue Chip under section 455B.175(1).

III. *Hawkeye's Liability.*

The administrative law judge found that Hawkeye had actively polluted the area in two respects: by permitting fuel oil to escape during its removal of the underground storage tank on the property and by maintaining above-ground storage tanks on the property that leaked. Hawkeye contends that the agency withdrew the allegations concerning the underground storage tank from consideration on the record at the hearing. It also contends that there is insufficient evidence to support the findings with respect to the above-ground storage tanks. We find merit in both of these contentions.

■ The record reflects that, with respect to the claim involving the underground storage tanks, the agency attorney removed those issues from consideration on the record at the contested case hearing:

MR. HARRIS [attorney for Hawkeye]: Could I just interject here? Is the DNR saying that tank leaked? I don't think there is anything in the complaint—I can understand how you would be concerned about what the samples would show at any given time, but concerning the DNR's position—

MR. LANDA [attorney for DNR]: We have no evidence to indicate that the tank leaked.

MR. HARRIS: Okay.

MR. LANDA: That's the reason for the soil sampling, one of the reasons for soil sampling.

MR. HARRIS: I just noted it wasn't in your Petition, and I was just wondering whether that's something that's in issue. If I understand, you're saying it isn't.

MR. LANDA: As far as the available information with regard to the condition of the site, the soil samples would have been

helpful to determine whether or not there was contamination in and around the gas—the diesel fuel tank, and the purpose of the questioning was to find out whether or not there were samples and whether or not they were analyzed. Our information indicates that that was a possibility, and now Mr. Reeve is testifying that they were destroyed, so that information isn't available.

MR. HARRIS: But my original question was, the tank—your concern isn't that there was a leak in the tank there?

MR. LANDA: We don't have any information to indicate that the tank was leaking.

MR. HARRIS: Because we still have the tank. That's what I'm saying. The evidence is available. The claim hasn't been made. We could have had the tank checked. I just want the record to be clear. You're not maintaining that the tank leaked?

MR. LANDA: We haven't alleged that the tank leaked. We're also not giving up on the issue of whether or not an appropriate investigation had been conducted to determine whether or not upon closure of the tank that it hadn't leaked.

■ We can draw no conclusion from this colloquy other than to find that the attorney for the agency withdrew any claim that Hawkeye had polluted the soil or groundwater as a result of circumstances relating to the underground storage tank. A litigant may stipulate that an issue is out of a case as well as stipulating to facts relating to certain issues. *Graen's Mens Wear, Inc. v. Stille–Pierce Agency,* 329 N.W.2d 295, 300 (Iowa 1983). We conclude that this is what the agency's attorney did with respect to the claim involving the underground storage tank.

Although the agency attorney clearly retained the right to assert a violation by Hawkeye in connection with the closing procedure employed in removal of the tank, that violation was not shown to have caused a prohibited discharge under section 455B.186. Consequently, although some sanction might have been imposed for the improper closing procedure, that violation does not support a sanction for site evaluation or cleanup costs.

■ With respect to the agency's finding that Hawkeye actively polluted the soil and groundwater as a result of spillage from three above-ground storage tanks on the premises, we are unable to find substantial evidence in the record to support that conclusion. The only evidence on this point was testimony of a representative of CNW who viewed the premises early in the period of Blue Chip's ownership and saw the above-ground storage tanks in place there. He noticed that the soil beneath the tanks was stained and that diesel fuel appeared to have been spilled there. He took photographs showing the stained area beneath these tanks, and those photographs were made a part of the record at the contested case hearing.

There is no evidence that the above-ground tanks leaked. Consequently, it must be assumed that the diesel fuel beneath the tanks was the result of spills that occurred when fuel was being withdrawn therefrom. Without any evidence quantifying the extent of the fuel beneath these tanks, it cannot be assumed that the amounts of spillage posed a threat to the groundwater. We conclude that the agency's finding with respect to the above-ground tanks is not supported by substantial evidence in the record as a whole. *See* Iowa Code § 17A.19 (1989).

As a result of our rejection of the agency's findings of prohibited discharges by Hawkeye under section 455B.186, the only remaining basis upon which liability is sought to be imposed is the agency's claim that an unlawful discharge occurred by reason of the fact that Hawkeye owned property from which diesel fuel was seeping into the groundwater. That is the same claim that the agency is making against Blue Chip and will be discussed in the next division of this opinion.

IV. *Liability of Hawkeye and Blue Chip Based on Theory That They Owned Property From Which Diesel Fuel Was Seeping Into the Groundwater.*

■ As to the agency's claim that Hawkeye and Blue Chip may be found to have

made prohibited discharges under section 455B.186 by reason of the fact that diesel fuel was seeping into the groundwater during the time that they owned the property, we conclude that this theory of liability does literally comport with the language of the prohibited discharge statute. We are unable to conclude, however, that the legislature intended that such liability be imposed upon prior owners in the chain of title who did not actively contribute to the pollution in the ground. That is the situation of Hawkeye in the present case. Support for this view is found in two federal court decisions interpreting the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607. In *Snediker Developers Ltd. Partnership v. Evans*, 773 F.Supp. 984, 989 (E.D.Mich.1991), and *Ecodyne Corp. v. Shah*, 718 F.Supp. 1454, 1456–58 (N.D.Cal.1989), the courts held that absent some nexus between their operations on the property and the disposal of hazardous waste, a prior owner is not subject to environmental sanctions incident to cleaning up toxic wastes. In the *Shah* case, the court specifically ruled that mere migration of the hazardous substance through the soil did not supply a sufficient nexus to satisfy this requirement. 718 F.Supp. at 1456–57.

■ The distinction that we draw between prior and present owners is based on the fact that present owners stand to benefit from the inspection, evaluation, and cleanup sanctions imposed by law. Although Blue Chip will not be liable for cleanup costs, based on our holding in Division I, it seems reasonable that it share in the cost of investigation, evaluation, and developing a remedial plan for abatement of the contamination. We hold that it is so responsible.

We have considered all issues presented and conclude that the decision of the district court should be modified by providing that Hawkeye is not subject to any of the sanctions imposed by the agency and that the liability of the other parties shall be determined in the manner specified in this opinion. The case is remanded to the agency for further proceedings not inconsistent with this opinion. Costs of appeal are assessed forty-five percent to the appellees, forty-five percent to CNW, and ten percent to Blue Chip.

**AFFIRMED AS MODIFIED.**