**WILLIAMS PIPE LINE COMPANY,**
Plaintiff,

v.

**BAYER CORPORATION, Defendant.**

Civil No. 4–95–CV–20158.

United States District Court,
S.D. Iowa,
Central Division.

April 14, 1997.

Paul Horvath, Des Moines, IA, Claire Eagan, Tulsa, OK, for plaintiff.

Jane McAllister, Ivan Webber, Des Moines, IA, for defendant.

## ORDER

BREMER, Chief United States Magistrate Judge.

This case arises from Defendant Bayer Corporation's ("Bayer") refusal to allow Plaintiff Williams Pipeline Company ("Williams") to enter its property to implement Williams' planned remediation of the environmental contamination on Bayer's property. The contamination has come from spills and leaks of petroleum hydrocarbons from above-ground storage tanks, and other releases on Williams' land. Williams seeks a declaratory judgment allowing it access to Bayer's land to install monitoring and recovery equipment for remediation of Bayer's property.

Bayer has filed a counterclaim based on state-law claims of strict liability, nuisance,

trespass, negligence, and alleging violation of environmental protection statutes: Iowa Code § 455B.186; the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901 et seq. (1995 & Supp.1997); and the Clean Water Act ("CWA"), 33 U.S.C. §§ (1986 & Supp.1997). Bayer seeks the full cost of cleanup of its land, compensation for other losses, abatement, and the reasonable cost of litigation, including attorney and expert-witness fees.

Trial was held on October 10 through 14, 1996. Written closing statements were filed by November 5, 1996. After the trial, the Court raised sua sponte the issue of whether it had subject matter jurisdiction over certain claims. Parties submitted written statements and supplemental authorities on February 20, 1997. At a hearing on February 26, 1997, counsel presented arguments on subject matter jurisdiction, and any related matters.

On April 10, 1997, Bayer filed a Motion to Re-open Discovery and for Additional Time to File a Motion to Re-open Evidence.

I. HISTORICAL AND PROCEDURAL BACKGROUND ........................ 1307
 A. Before 1985 ................................................... 1308
 B. 1985 to 1988—First NPDES Permit Period ........................ 1309
 C. 1989 to 1993—Second NPDES Permit Period ....................... 1311
 D. 1994 to Present—Third NPDES Permit Period ..................... 1313
 E. The Claims ................................................... 1315
II. FURTHER FINDINGS OF FACT AND CONCLUSIONS OF LAW ........... 1316
 A. Clean Water Act Claim ......................................... 1316
 1. Background ................................................. 1316
 2. Citizen–Suit Provision ..................................... 1317
 a. Exception to Citizen Suit Provision ...................... 1317
 1) Violation ........................................... 1318
 2) Commence an Action ................................. 1320
 3) Comparable to Subsection 309(g) ..................... 1323
 4) Diligent Prosecution ................................. 1324
 b. Alleged Violations within Scope .......................... 1325
 1) Discharge to Swamp ................................. 1325
 2) Seepage from Swamp ................................. 1326
 c. Conclusion ............................................. 1327
 B. Resource Conservation and Recovery Act Claim ..................... 1327
 1. Spills and Leaks without a Permit .......................... 1327
 2. Placing Groundwater in Surface Impoundment ................. 1329
 C. Iowa Code Chapter 455B Claim ................................ 1329
 D. State Tort Law Claims ......................................... 1329
 E. Damages ..................................................... 1331
 1. Nature of Damages ......................................... 1331
 2. Measure of Damages ....................................... 1331
 a. Diminution of Market Value ............................. 1332
 b. Special Damages ........................................ 1332
 c. Injunctive Relief ....................................... 1332
 F. Claim for Declaratory Relief .................................... 1333
 G. Motion to Re-open Discovery ................................... 1334
III. CONCLUSION ................................................... 1335
V. APPENDIX A ................................................... 1336

The Court makes the following findings of fact and conclusions of law based on the record submitted.

## I. HISTORICAL AND PROCEDURAL BACKGROUND

Williams transports petroleum products through its common-carrier interstate-pipe-line system, which includes terminal facilities in several states. The Williams' facility at issue in this case lies on 100 acres in Pleasant Hill, Iowa, approximately 2,000 feet north and within the flood plain, of the Des Moines River, a navigable water of the United States. (*See* Appendix A at 1–2.) Williams

stores and transports more petroleum compounds than any other facility in Iowa.

Bayer's facility lies adjacent to Williams' site, west and across S.E. 43rd Street. Bayer's facility encompasses about 35 acres, of which approximately five acres is contaminated. A generating station owned by Iowa Power and Electric Company extends southwest, and is located south of Bayer's property toward the Des Moines River.

### A. Before 1985

A significant number of spills, leaks and other releases have occurred at the Williams site over the years.[1] In one instance, tens of thousands of gallons of crude oil spilled from a pipeline break at the Williams site in approximately 1981 or 1982. Jack Clemens, director of the Iowa Department of Natural Resources' ("DNR") Environmental Protection Division Field Office 5, testified that his office responded to the spill, and he saw some of the oil settled in a wetland area, referred to as the swamp, on the southeastern end of the site. Williams was trying to clean the oil to use it again. Clemens testified the oil "was so thick they had to use special machines and front end loaders and mix straw with it, and they had to clean the straw out again." Ex. 82, Clemens Dep. at 10. He said the attempt to clean the oil in the swamp was "one of the biggest [operations] that they ever had in the state of Iowa." *Id.*

Concerned about pollution as a result of spills and leaks of gasoline and diesel fuels, DNR initiated an environmental investigation on the Williams site. In January 1983, DNR directed Williams to have an environmental consulting firm investigate the site and prepare a report. Leggette, Brashears & Graham, Inc. ("Leggette"), conducted a preliminary investigation of possible hydrocarbon contamination of the shallow groundwater system at Williams' Des Moines site. Leggette's report, submitted in May 1983, confirmed the presence of hydrocarbon contamination in the groundwater system.

After reviewing Leggette's report, DNR required Williams to devise a remediation plan for DNR approval, and begin remediation efforts to reduce the gasoline or petroleum compounds in the groundwater that exceeded the state's clean-up levels. DNR's rules establish clean-up goals based on Iowa Administrative Code Chapter 135 (underground storage tank levels) and federal Environmental Protection Agency ("EPA") standards. Steve Grgurich, who has worked in enforcement for approximately 11 years for DNR, testified that DNR's goal for the Williams site was to have contaminant levels the same as the maximum contaminant levels for drinking water.

In compliance with DNR's directive, Williams contracted with Leggette to drill additional exploratory wells in September 1983 to further define the extent of contamination. In a January 1984 report, Leggette concluded the hydrocarbon-product contamination on the Williams site consisted mainly of gasoline in a water emulsion, and the direction of the groundwater movement was to the south and southwest, toward the Des Moines River.

The consultants determined that a test recovery well efficiently controlled the movement of groundwater within a radius of about 800 feet from the well after 50 hours of pumping.

To remediate, Leggette recommended that Williams install a permanent system consisting of a permanent recovery well; water-pumping equipment, including an underground discharge pipe extending from the well head to the burn pond[2] in the swamp area; a hydrocarbon pump to be installed above the water pump; a tank to store recovered hydrocarbons; a water-discharge-and-treatment system; and water-quality monitoring from the discharge pipe and from the swamp. The report described the water-discharge-and-treatment system as follows:

---

1. From 1970 to 1995, Williams reported approximately 116 spills, leaks or other releases occurring on its property. *See* Ex. FK.

2. Leggette decommissioned three burn ponds on the Williams site, including one in the swamp in December 1989, and contaminated sediments were removed from the burn ponds. Ex. CJ at 4.

1. The water discharge from the recovery well should be pumped to the swamp in the burn pond area.

2. The swamp area should be used as a retention basin for ground-water discharge.

3. The movement of water from the swamp to the Des Moines River should be controlled by the valve in the existing piping system which connects the swamp with the river.

4. The swamp water should be treated by one or more floating aeration pumps. The function of these pumps is to reduce dissolved hydrocarbon components to levels acceptable to the State of Iowa.

5. When the water quality in the swamp meets surface water discharge standards, the discharge of water from the swamp to [sic] Des Moines River should proceed. Ex. CA at 23. Leggette's recommendations stated, "Additional water treatment· should be considered in the event that the water quality in the swamp area does not meet the State of Iowa requirements." *Id.* at 24.

The state approved the proposed system, and Williams applied to DNR for a permit under the National Pollutant Discharge Elimination System ("NPDES") and the CWA to implement the system. Under Iowa law, all applications for discharge permits were subject to public notice and opportunity for public participation, including public hearings and written views. Iowa Code § 455B. 174(4)(b) (1983); 900 Iowa Admin. Code 64.5 (1983).[3] The record does not indicate that Syntex Agribusiness, the owner of the Bayer facilities from approximately 1975 to 1985, ever submitted its views or participated in a public hearing regarding Williams' permit request and proposed water-discharge-and-treatment system.

## B. 1985 to 1988—First NPDES Permit Period

On January 23, 1985, DNR issued Williams an NPDES permit[4] and modified the permit in February 1985. The permit authorized Williams "to operate the disposal system and to discharge the pollutants specified ·in this permit," and the permit required Williams to comply with the effluent limitations, monitoring requirements and other terms set forth in the permit.[5] Grgurich explained, "the permit regulated the extraction of underground water and the discharge of it as it travels through the swamp for treatment and out into the waters of the State, ... surface drainage area to the Des Moines River." (Partial Tr. at 20–21.) The monitoring system established by the permit designates the frequency of sampling of the wastewater and also the concentrations of contaminants discharged from the site to the river. The state described· the permitted water-discharge-and-treatment-system in the same words as were used in Leggette's 1984 report.[6]

3. Regarding written comments, the Iowa Administrative Code provided as follows:

The department shall provide a period of not less than thirty days following the date of the public notice during which time interested persons may submit their written views on the tentative determinations with respect to the NPDES application. All written comments submitted during the thirty-day comment period shall be retained by the department and considered by the executive director in the formulation of the executive director's final determinations with respect to the NPDES application.

900 Iowa Admin. Code 64.5(2)(b) (now codified at 576 Iowa Admin. Code 64.5(2)(b)).

The administrative code's provision regarding public hearings stated in pertinent part as follows: *"Public hearings on proposed NPDES permits.* The applicant ... or any interested agency, person or group of persons may request or petition for a public hearing with respect to an NPDES application." 900 Iowa Admin. Code 64.5(6) (now codified at 576 Iowa Admin. Code 64.5(2)(b)).

4. The permit was Iowa NPDES Permit Number 77–27–1–26.

5. A second permit, Iowa Permit Number 05193, authorized Williams to extract groundwater from RW1.

6. The permit stated the system should include the following:

1. The water discharge from the recovery well should be pumped to the swamp in the burn pond area.

2. The swamp area should be used as a retention basin for ground-water discharge.

3. The movement of water from the swamp to the Des Moines River should be controlled by the valve in the existing piping system which connects the swamp with the river.

4. The swamp water should be treated by one or more floating aeration pumps. The func-

In the permit, the state set effluent limitations and monitoring and reporting requirements.[7] The permit identified two sites from which Williams was to collect samples to monitor wastewater: the recovery well and "the discharge from the swamp area at the dike prior to mixing with Iowa P[o]wer discharge." Ex. 56, February 25, 1985, Permit at 3, n. 1. The permit stated that monitoring would not be required when no discharge from the swamp area was occurring. *Id.*

Williams' remediation plan initially consisted of pumping dissolved hydrocarbons out of the groundwater and discharging them into the swamp, which was to be used as a wetland biologic treatment area. Williams' remediation system was patterned after a then commonly-accepted remediation plan, often called "pump and treat."

In March 1985, Williams installed a 45–feet–deep recovery well, RW–1, located at the southwest corner of the site. Ex. AY at 2. RW–1 contains a submersible groundwater-depression pump, and pumps groundwater from the site and into a pipe feeding into the swamp. RW–1's pump can operate at varying speeds. Ron Frehner, Williams' expert witness, testified that at faster speeds, the pump can extract contaminated groundwater from Bayer's property. At DNR's direction, Williams added to its remediation plan a submersible skimming pump to remove free-phase product from the well.[8]

Williams installed a floating aeration pump in the swamp as required under the permit. Treatment in the swamp involved breaking down the hydrocarbons through biodegradation[9] and through volatilization.[10] Williams

monitors the outfall from the swamp to a drainage area adjacent to the Des Moines River.

Bayer maintains that seepage from the swamp has in the past and continues to contaminate its land. The evidence does not support Bayer's allegation. The Court finds that no contamination emanating from the swamp through seepage into groundwater contaminates Bayer's property, because the swamp is not hydrologically connected to Bayer's property. The Court also finds that no alleged seepage from the swamp into groundwater that reaches the Des Moines River contaminates Bayer's property.

In addition to its water-treatment-and-discharge system, Williams has instituted another remediation system on its property—a free-phase-product culvert system. Grgurich testified he has had success with this emergency-response system over the years in extracting free-phase product out of the ground before it dissolves and causes a larger problem than already exists. At Williams' site, four 36–inch culverts are dug into the ground and used as recovery wells around tank No. 620, an above-ground tank. Ex. AY at 2. Williams rotates two scavenger pumps among the four wells to remove free-phase product as needed, for example, following spills. After drilling through the ground, Williams' employees use the pumps to extract free-phase product off the groundwater's surface.

Syntex Agribusiness planned to sell its property, including a research farm south of Carlisle, Iowa. On March 18, 1985, an appraisal listed the estimated value of Syntex

tion of these pumps is to reduce dissolved hydrocarbon components to levels acceptable to the State of Iowa.

5. When the water quality in the swamp meets surface water discharge standards, the discharge of water from the swamp to [sic] Des Moines River should proceed.

Ex. 56, February 25, 1985, Permit at 4.

7. Specifically, the permit set requirements for the following: chemical oxygen demand, total suspended solids, oil and grease, gasoline, benzene, toluene, xylene, ph [sic], and temperature. Ex. 56, February 25, 1985, Permit at 2.

8. Free-phase product is petroleum that is not dissolved in water, but is floating on top. Free-phase product is removed by skimming it off the water's surface and putting it in containers, usually above-ground storage tanks.

9. During biodegradation, a natural process, bacteria convert contaminants in the swamp into less hazardous materials.

10. Volatilization is a process in which aerators installed in the swamp add oxygen to the wastewater to breakdown the gasoline contaminants and make them readily vaporizable.

Agribusiness' plant facilities as $7,592,000 [11] and the value of its research farm as $810,000.[12] *See* Ex. CP at 8–9. The appraiser based the estimate on the highest and best use of the plant for the continued production of biologicals and pharmaceuticals. Ex. CP at 1. In June 1985, Syntex Agribusiness sold its facilities, including the research farm, to Diamond Scientific Company ("Diamond Scientific"), a manufacturer of animal pharmaceuticals and a wholly owned subsidiary of Agrion. Ex. 17 at 30. The sale price of the plant was only $2,603,420, including land and improvements. Ex. 17 at 30. An appraisal report stated the sales price was below the market value because of "several different factors including promises made by the grantee concerning future employment of existing employees." *Id.*

In 1988, DNR inspected Williams' groundwater remediation system and prepared a Report of Investigation. *See* Ex. AY at 3. The report noted that from the start of the remediation through June 1988, RW–1 had pumped 273 million gallons and recovered 385 gallons of free-phase product. In addition, 17,133 gallons of free-phase product had been recovered at tank No. 620.

Williams filed for renewal of its permit in 1988. Iowa law provides the same notice and public-participation procedures in connection with requests for reissuance of an NPDES permit as it does for the initial issuance of a permit. 567 Iowa Admin. Code 64.8(1). The record does not indicate that Agrion ever submitted its views or participated in a public hearing regarding Williams' request for reissuance of its NPDES permit.

The state asked Williams to prepare a report to summarize the status of the recovery operation at the Williams site. Williams contracted with Leggette to produce the report. In June 1988, a Leggette hydrogeologist, John Dustman, and Grgurich met to discuss Williams' recovery operation. *Id.* at

2. Leggette submitted the status report on August 3, 1988. Ex. CD.

*C. 1989 to 1993—Second NPDES Permit Period*

In February 1989, Mobay Corporation ("Mobay"), a wholly owned subsidiary of Bayer Corporation, bought Diamond Scientific from Agrion. The sales price for the ongoing operation, including the farm, was $3,674,200. Ex. 17 at 30.

The state modified and reissued Williams' NPDES permit on May 10, 1989. In the permit, the state modified the effluent limitations for benzene, toluene and xylene. The state added a third required sampling location: from the tank used to store hydrostatic test water prior to discharge to the swamp. Ex. 57 at 3. The state modified the description of the permitted water-discharge-and-treatment system as follows:

1. The water discharge from the recovery well should be pumped to the swamp in the burn pond area.

2. The movement of water from the swamp to the Des Moines River shall be controlled by the valve in the existing piping system which connects the swamp with the river.

3. When the water quality in the swamp meets permit limits, the discharge of water from the swamp to the Des Moines River may proceed.

4. Sample swamp at discharge pipe prior to discharge.

Ex. 57 at 4.

Similar to the 1985 permit, the 1989 permit lists the "receiving watercourse designation" as the "unnamed surface drainage area tributary to the Des Moines River." The permit lists "the designated stream" as the Des Moines River.

At DNR's direction, Williams commissioned Leggette to prepare a November 1989

---

11. Specifically, the appraisal established the following estimated values for the plant: $3,840,000 for buildings, land and site improvements; $3,340,000 for production, research and testing equipment; $260,000 for office furniture, furnishings and equipment; and $152,000 for maintenance, shipping and warehouse equip-

ment. Ex. CP at 8–9. The appraised value did not include patents, licenses or agreements. *Id.* at 2.

12. The appraised value of the farm included buildings, land, and site improvements. Ex. CP at 9.

status report concerning Williams' recovery and monitoring systems. The report discussed modifications Williams had made to the recovery system to improve efficiency, including the addition of the submersible pump in RW–1 to remove floating free-phase contamination in the well. Ex. CI at 6. Use of the pump, the report stated, would probably result in less hydrocarbon reaching the swamp. *Id.* at 9.

In 1990, Mobay gave Williams permission to install permanent groundwater monitoring wells on its property. Ex. CG. Williams installed the monitoring wells, MW–28, MW–29 and MW–30, in 1990. Williams gathered data from the wells to monitor the cleanup and submitted the information to DNR. Ex. 22 at 5.[13] Mobay, too, installed monitoring wells on its property.

Williams submitted to Grgurich the 1990 status report of the recovery operation prepared by Leggette. Ex. CD at 35.

On November 9, 1990, Grgurich completed a Report of Investigation concerning Williams. Ex. 18 at 13–14. Grgurich reported the results of the state's investigation of concerns about alleged elevated hydrocarbons in the RW–1 discharge to the swamp in 1989. He stated that samples were collected from the swamp in late 1989 and early 1990, and were analyzed for amounts of hydrocarbons, benzene, toluene and xylene. The amounts were extremely low, and "No obvious deterioration of the swamp has been observed," Grgurich concluded. *Id.* at 14.

"The Department [DNR] recognizes the cleanup at the Williams Pipeline facility is on going," Grgurich's report stated. *Id.* He noted that in the past Williams had submitted annual status reports at DNR's request. He directed Williams to provide another annual report by 1991 and each year thereafter, "until groundwater cleanup is complete." *Id.* Grgurich stated the annual reports should include the following information: amount of contaminated water treated, amount of free-phase product recovered, summary of analysis of levels of hydrocarbons, benzene, toluene and xylene in samples taken from monitoring wells, and assurance

that heavy petroleum hydrocarbons were not accumulating in the swamp's sediment. These reports are available for public viewing at DNR.

After reading the February 1991 report that showed hydrocarbons on the Mobay property, Grgurich instructed Williams to increase the pumping in the recovery zones in an attempt to reduce contamination levels around the monitoring wells on Mobay's property.

A 1991 appraisal estimated the market value of Mobay's real estate alone was $3,375,-000. Ex. 17 at 4. In making the estimate, the appraiser assumed the property could be sold to someone who would continue using the special licenses to operate the laboratory and production facilities. *Id.* If the property was sold to someone who would be converting the buildings to another use, the appraiser estimated the market value would drop to $1.2 million to $2 million. *Id.* The appraiser also based his opinion on the owner's statement that no contamination spreading from the Williams site had been detected on the Mobay property. *Id.* at 49.

On January 1, 1992, Mobay merged with Bayer and several other corporations to form Miles, Inc. ("Miles"), based in Pittsburgh, Pennsylvania. Diamond Scientific became a wholly owned subsidiary of Miles. The operation in Des Moines was administered by Miles Agriculture Division, Kansas City. Ex. 19. Miles planned to sell its Des Moines property and product licenses in Des Moines, and the company prepared a memorandum providing information for prospective buyers. Ex. 21. Miles announced its decision to its Des Moines employees on June 30, 1992. Ex. 21 at 28.

The 1991 status report prepared by Leggette and submitted to Williams on February 3, 1992, stated that the results from samples collected from RW–1, the swamp, and the swamp discharge point "indicate that the method of water treatment is effective at reducing the dissolved hydrocarbon concentrations." Ex. 22 at 4. The report also related information from the monitoring wells on the Miles site. Data from monitoring well

**13.** Williams also provided the information to Miles in 1992 at Miles' request.

MW–28 appeared clean. Monitoring wells MW–29 and MW–30 had slightly higher hydrocarbon concentrations. The report stated that groundwater in the vicinity of MW–29 and MW–30 was within the capture zone of RW–1, the system on Williams' property.

The report included an analysis of data from samples of swamp sediment. The data indicated the presence of heavy-end hydrocarbons in the sediments. Leggette concluded the contamination in the sediments most likely resulted from residual contamination that occurred during a 1982 release of creosote into the swamp. *Id.* at 5–6.

On August 7, 1992, William Moran, an environmental engineer for Miles, wrote to John Haldiman, a Williams' environmental engineer, stating he had recently become aware of Williams' three groundwater monitoring wells on the Miles property and asking Haldiman to provide sampling and analytical data from the wells, including a sampling schedule. Ex. 19. Haldiman provided the requested information. Ex. 20.

As required by DNR, Williams submitted annual site status reports for 1992 and 1993. The 1992 report, prepared by Leggette, stated no compounds were detected in MW–28 during the year, and that MW–29 and MW–30 had low to moderate concentrations of hydrocarbon compounds.

On December 21, 1992, Jim Stricker, on behalf of DNR, conducted a site inspection at the Williams site. Ex. 22 at 2. Stricker's inspection report showed that since December 1990, Williams had not submitted to DNR the required monthly monitoring reports or data from the recovery well discharge. In a letter dated February 16, 1993, Clemens notified Williams that it was in violation of its NPDES permit. Ex. AY at 1. Clemens told Williams that it must immediately initiate the required monitoring and reporting. Stricker's report also noted that Williams had sampled only six of the 30 monitoring wells in 1992, and Stricker recommended that all the monitoring wells should be sampled in 1993 to determine the continued and current extent of groundwater contamination.

On February 23, 1993, Williams responded that it had monitored RW–1's discharge from December 1990 to 1992 as required, but had never compiled and forwarded the information to DNR. Ex. AZ at 1. Williams sent the data and noted that no discharge from the swamp into the Des Moines River had occurred during the period. Williams also stated that it would revise its sampling schedule and collect samples from more monitoring wells to define the current extent of the groundwater contamination. *Id.*

Williams' 1993 annual report, prepared by the Terese Miller Environmental Group, stated that some, but not all, of the targeted compounds were detected in swamp samples collected in 1993. Ex. 27 at 5. The highest concentration of benzene and of fluid levels was found in MW–30, which "is within the anticipated capture zone of RW–1." *Id.*

In December 1993, Diamond Animal purchased Miles' Diamond Scientific stock for $1.25 million, after declining to buy the land, stock, and plant for the $3.25 million asking price. Diamond Animal entered into a long-term lease of Miles' Diamond Scientific facility for $150,000 per year.

### D. 1994 to Present—Third NPDES Permit Period

By February 1994, Williams had discussed with DNR its plan to extend its remediation system by adding an air-sparging and soil-venting system ("AS/SVE") on its property and on Miles' property, in an area directly west of the railcar loading rack on Williams' property. This is the area of highest contamination. Ex. 27 at 1. In a February 22, 1994, letter to Clemens, Williams stated that the date by which Williams could accomplish the system expansion onto Miles' property would depend on the availability of access to the property. Williams' experts estimated that within three years of implementing the complete AS/SVE system, contamination levels would be significantly reduced.

AS/SVE is a recovery and treatment system that reduces dissolved hydrocarbon concentrations by simultaneously treating the soil and the groundwater, thus speeding up the remediation process. During the AS/SVE process, air-sparging wells inject oxy-

gen into the saturated zone of the ground (the part of the subsurface that is soaked with groundwater) to remove volatile compounds. When oxygen is injected below the contaminated area, bubbles form, rise, and carry dissolved contaminants into the unsaturated zone (that part of the subsurface located above groundwater). As oxygen concentrations in the ground rise, the biodegration of the hydrocarbons increases. A vacuum sucks air through underground walls to vaporize the volatile contaminated compounds found in the unsaturated zone.

Tony Ying, Williams' expert witness, testified that an advantage of the AS/SVE system is that it adapts to pull contaminants from the soil at high water levels. Grgurich testified that DNR considers AS/SVE to be a proven technology, and that AS/SVE has been recognized as a state-of-the-art, leading-edge remediation system for approximately two to three years. He testified he has seen AS/SVE used successfully at other sites, including one that was cleaned up in a couple years to the same level Williams is working towards, enabling DNR to stop monitoring the site. At that site, the system apparently extracted contaminates from under a building.

On June 16, 1994, the state renewed Williams' NPDES permit requiring Williams to comply with the conditions stated in the permit. The record does not indicate that Miles ever submitted its views or participated in a public hearing regarding Williams' request for reissuance of its permit.

The new permit addressed Williams' proposed use of AS/SVE by requiring the company to monitor "petroleum contact water after treating by air stripping prior to discharge," in addition to mandating monitoring from the recovery well, at the discharge from the swamp area at the dike, and from the tank used to store hydrostatic test water prior to discharge to the swamp. Ex. 58 at 4. The state's description of the permitted water-discharge-and-treatment system was essentially the same as in the previous permit.

In March 1994, Clark Ridpath, Miles' vice president, met with Steve Cropper, president and CEO of Williams. Ridpath told Cropper that Miles could not sell the property because of environmental contamination. Cropper proposed that Williams would investigate the nature and extent of contamination on the Miles property and remediate, using the AS/SVE process and the swamp. On July 5, 1994, Williams submitted to Miles a work plan for the proposed investigation and remediation. Williams asked for access to Miles' site to properly analyze the nature and extent of contamination and begin remediation. After a Miles consultant expressed the opinion that AS/SVE would not successfully remediate Miles' property, Miles rejected the work plan and denied Williams access to its property to further investigate or install AS/SVE equipment. Ridpath asked Williams to buy the Miles site for $4.5 million rather than undertake remediation.

On August 9 and 10, 1994, Williams conducted field tests of the proposed AS/SVE system. Ex. 30 at 1. Williams sent its field test results and proposed work plan for the new AS/SVE system to Grgurich on September 21, 1994. In the accompanying letter, Williams noted that because of problems with access to Miles' property, all work was being conducted solely on Williams' property. Williams planned to install 19 AS/SVE wells in its railcar loading rack area. Three skid-mounted AS/SVE units would be installed and connected to the wells. Williams discussed the proposed AS/SVE system with DNR officials and obtained their approval for use of the system. Williams installed the new AS/SVE equipment and began operating the system in 1995.

In 1995, Miles was renamed Bayer Corporation. The AS/SVE system on Williams' site is designed to abate and remediate contamination on Bayer's property, as well as reduce the contamination on Williams' property.

Beginning in 1995, Williams submitted quarterly status reports to DNR. The 1995 third-quarter report stated that benzene concentrations in off-site monitoring wells, including MW–29 on the Bayer site, were trending down. Ex. CV at 4. Figure 10 attached to the third-quarter report shows a slow downward trend in the amount of moni-

tored contaminants in the wells over the years 1991 to 1995. *Id.* at 28. From 1993 to 1996, the contamination levels on Bayer's property decreased in the following two areas: (1) where the concentration of benzene ranges from 100 to 1,000 parts per billion, and (2) where the concentration is greater than 1,000 parts per billion. Frehner testified, and the court finds, this decrease was due to the operation of the recovery well and AS/SVE system on Williams' property.

Clemens testified that DNR is concerned with reducing contamination on Bayer's property as well as on Williams' property. Grgurich's department in DNR has not set a time limit for completion of remediation at the Williams or Bayer site. He testified he was surprised Bayer had not contacted his department regarding remediation efforts.

Grgurich testified that, over the years, the level of gasoline or petroleum compounds in the groundwater on the Williams site has been considerably reduced in some wells. In some wells down-gradient, however, the contamination level has stayed the same or "gotten a bit more concentrated" despite recovery efforts. (Partial Tr. at 13.) The site is difficult to remediate, Grgurich testified, because it is so large, has high groundwater, and contains a large number of contaminants, which have accumulated over time. Nevertheless, Grgurich believes, and the court finds, that Williams has made a genuine effort to clean up the site under DNR's direction, has spent a "considerable amount of money" to remediate the site, and has exceeded DNR's requests in terms of the treatment equipment the company has installed. (Partial Tr. at 10.) To Grgurich's knowledge, Williams has has done a "pretty fair" job of recovering spilled products, which reduces the amount of product that enters the groundwater and migrates off site. (Partial Tr. at 9–11).

When a company is cooperating to meet DNR's clean-up goals, the department generally does not initiate formal enforcement actions against the company. The department sets up a system, including site investigations and reports, to monitor the company's remediation efforts. If, in the course of monitoring a company's clean-up effort, DNR discovers that a company is not adequately cleaning up a site, the department typically asks the company to submit a work plan for improving site conditions. To enforce compliance if a remediation project is not proceeding at a reasonable pace, DNR has the authority to issue administrative enforcement orders and assess civil penalties. DNR issued no such order to Williams, although DNR considered the action. When contamination on a site reaches a level acceptable to the state, DNR permits the company to stop participating in the monitoring system it established for the site.

## E. The Claims

On February 9, 1995, Miles sent notice to Williams, the EPA administrator, and DNR, as required by 33 U.S.C. § 1365(b)(1)(A), indicating its intent to sue Williams under the CWA, RCRA and Iowa's environmental citizens suit statute. Neither the EPA nor the state of Iowa initiated a separate environmental action.

In response to the notice, Williams filed the instant action seeking access to Bayer's property to implement its planned AS/SVE remediation effort. Williams alleged it was entitled to access because such a right was implied by Bayer's CWA claim. Bayer filed counterclaims, asserting that Williams had violated the CWA, RCRA, and various state laws. Williams argued Bayer's counterclaims were barred by the applicable statutes of limitations, the doctrines of laches and unclean hands, failure to comply with statutory notice provisions, and lack of standing.

The parties disagree as to the number of air-sparging wells required to treat the contaminated ground and whether such a regimen alone is sufficient to permanently remediate Bayer's property. Bayer's expert testified that effective remediation requires at least 120 air-sparging wells at a cost of $1.3 million, and treatment of the contamination under certain buildings at a cost of approximately $100,000. Bayer further alleges permanent remediation can be achieved only by building a slurry wall to physically isolate Bayer's site from the Williams property. Evidence showed such a wall would cost from $1.7 to $3 million dollars. Bayer

also suggested that the soil could be removed, washed, and replaced, at a cost of approximately $8 million. This, however, allegedly would not take care of contamination under the buildings.

Williams proposes to use 19 to 21 air-sparging wells on the Bayer site, at a cost of approximately $500,000. Ying testified that using AS/SVE on Bayer's property could significantly reduce contamination to state-approved levels within three years. Because Williams has not had access to the Bayer site, this plan may have to be modified, and will require ongoing monitoring of its effectiveness.

Bayer seeks to be made whole through compensation for the lost value of its land because of contamination. Even aggressive AS/SVE treatment, Bayer asserts, will not address the long-chain nonvolatile aromatic hydrocarbons and MTBE contamination present on Bayer's property. Bayer claims it is entitled to recover the resultant loss in property value of approximately $2 million (the difference between its current leased value as contaminated property, approximately $1.7 million, and the actual market value, approximately $3 to $3.75 million). Bayer further seeks damages for restoring its land to a clean condition, which the company alleges will cost a minimum of approximately $4.4 million.

Because Williams bases its claim for access to Bayer's property solely on an implied right stemming from Bayer's CWA claims, the Court will analyze Bayer's counterclaims before addressing Williams' claim.

## II. FURTHER FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Clean Water Act Claim

#### 1. Background

Bayer claims that Williams is in violation of the CWA in that it discharges a pollutant into a water of the United States without a permit regulating its discharge in violation of 33 U.S.C. § 1311(a) (1986). Bayer bases this claim on two allegations: (1) Williams is discharging pollutants into the swamp, a wetland, without a permit, in that Williams' NPDES permit does not address such a discharge, but covers only the discharge from the swamp to outfall No. 1; and (2) Williams is discharging pollutants into the Des Moines River without a permit, in that Williams' NPDES permit does not address the seepage of pollutants from the swamp to the groundwater that reaches the Des Moines River at a point other than that authorized in the permit.

The CWA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 52, 108 S.Ct. 376, 379, 98 L.Ed.2d 306 (1987); *United States Envtl. Protection Agency v. City of Green Forest, Ark.*, 921 F.2d 1394, 1398 (8th Cir.1990), *cert. denied,* 502 U.S. 956, 112 S.Ct. 414, 116 L.Ed.2d 435 (1991); 33 U.S.C. § 1251(a) (1986). To help accomplish that goal, section 301 of the Act prohibits the discharge by any person of any pollutant into navigable waters, except as authorized in specific sections of the Act. *Gwaltney*, 484 U.S. at 52, 108 S.Ct. at 378–79; *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1525 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 482, 136 L.Ed.2d 377 (1996); 33 U.S.C. § 1311(a) [14].

One such section is § 402, which establishes the National Pollution Discharge Elimination System (NPDES). *Gwaltney*, 484 U.S. at 52, 108 S.Ct. at 378–79, 33 U.S.C. § 1342. Under that system, the EPA's administrator issues NPDES permits, which authorize effluent discharges in compliance with conditions stated in the permit. *Gwaltney*, 484 U.S. at 52, 108 S.Ct. at 378–79; *Green Forest*, 921 F.2d at 1398, 33 U.S.C. § 1342(a). Specifically, the permits control the quantity, rate and concentration of effluents that may be discharged. *City of Ames, Iowa v. Reilly*, 986 F.2d 253, 254 (8th Cir.1993).

The CWA authorizes a state to develop and administer its own permit program, as

---

**14.** Section 1311(a) states: "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).

long as the program meets federal requirements and gains approval from EPA's administrator. *Gwaltney*, 484 U.S. at 52, 108 S.Ct. at 378–79; *Green Forest*, 921 F.2d at 1398, 33 U.S.C. § 1342(b). If the EPA determines a state has adequate authority to implement and enforce a permit program, it will suspend issuance of federal permits. *Gwaltney*, 484 U.S. at 52, 108 S.Ct. at 378–79; *Green Forest*, 921 F.2d at 1398, 33 *U.S.C.* § 1342(c). The EPA has authorized the State of Iowa to establish and implement its own NPDES permit program. *City of Ames*, 986 F.2d at 255. The Iowa agency responsible for administering that program is the DNR's Environmental Protection Division.

When a person violates the CWA, the Act authorizes several enforcement options, including actions by federal and state government. *Green Forest*, 921 F.2d at 1399, 33 U.S.C. §§ 1319, 1342(b)(7). Additionally, the CWA's citizen-suit provision empowers private citizens to bring civil actions against violators. *Gwaltney*, 484 U.S. at 52, 108 S.Ct. at 378–79; *Green Forest*, 921 F.2d at 1399, 33 U.S.C. §§ 1365(a)(1), 1365(f).

### 2. Citizen Suit Provision

Bayer invokes federal court jurisdiction under CWA's citizen suit provision, 33 U.S.C. § 1365(a) (1986).[15] Under the citizen-suit provision, citizens may bring suit against a person alleged to be in violation of "an effluent standard or limitation under this chapter" or "an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1).

■ The term "an effluent standard or limitation under this chapter" includes an unlawful act under section 1311, an effluent limitation or other limitation under sections 1311 or 1312, and the conditions of either a federal or state NPDES permit or permit condition. 33 U.S.C. § 1365(f) (1986 & Supp. 1996). Section 1311(a) makes it unlawful to discharge any pollutant except in compliance with the NPDES permit required in section

1342. *Washington Wilderness Coalition v. Hecla Mining Co.*, 870 F.Supp. 983, 985 (E.D.Wash.1994). Thus, a citizen suit can be based on allegations that the defendant is discharging without an NPDES permit. *Id.*

■ CWA's private-enforcement provision has two purposes: (1) to foster agency enforcement, and (2) to act as an alternative enforcement mechanism absent agency enforcement. *Connecticut Coastal Fishermen's Assoc. v. Remington Arms Co.*, 777 F.Supp. 173, 178 (D.Conn.1991) (citations omitted), *aff'd in part, rev'd in part by* 989 F.2d 1305 (1993); *accord Arkansas Wildlife Fed'n v. ICI Americas, Inc.*, 29 F.3d 376, 380 (8th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1094, 130 L.Ed.2d 1062 (1995). The citizen-suit provision puts the citizen in the role of a private attorney general. *Green Forest*, 921 F.2d at 1403. Where the government fails or declines to act, the CWA allows citizens acting as private attorneys general to bring suit. *Id.* at 1405. "That does not mean, however, that [a citizen-plaintiff] is ipso facto entitled to its own, 'personalized' remedy in this or any other CWA case." *Id.* Citizen suits should not "considerably curtail the governing agency's discretion to act in the public interest." *Arkansas Wildlife*, 29 F.3d at 380.

#### a. Exception to Citizen–Suit Provision

An exception to federal district court's jurisdiction over citizen suits is provided in subsection 309(g), which states as follows:

(6) Effect of order

(A) Limitation on actions under other sections

Action taken by the Administrator or the Secretary, as the case may be, under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation....

(ii) with respect to which a State has commenced and is diligently prosecuting

---

**15.** Section 1365(a) states in pertinent part:
The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an or-

der, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.
33 U.S.C. § 1365(a).

an action under a State law comparable to this subsection . . .

. . . .

shall not be the subject of a civil penalty action under subsection (d) of this section or section 132 1(b) of this title or section 1365 of this title.

33 U.S.C. 1319(g)(6); *Arkansas Wildlife,* 29 F.3d at 378–79 n. 3.

The CWA was intended to be enforced primarily by the government, and citizen suits are intended merely to supplement the government's enforcement power, as explained by the Court in *Gwaltney,* 484 U.S. at 50, 108 S.Ct. at 378:

> The bar on citizen suits when governmental enforcement action is underway suggests that the citizen suit is meant to supplement rather than supplant governmental action. The legislative history of the Act reinforces this view of the role of the citizen suit. The Senate Report noted that "[t]he Committee intends the great volume of enforcement actions to be brought by the State," and that citizen suits are proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility."

*Id.* (quoting S.Rep. No. 92–414, p. 64 (1971), U.S.Code Cong. & Admin. News 1972, pp. 3668, 3730, reprinted in 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973)) (quoted in *Green Forest,* 921 F.2d at 1403).

The government, representing society as a whole, is usually in the best position to vindicate societal rights and interests. *Green Forest,* 921 F.2d at 1405 (quoting *Hudson River Fishermen's Ass'n v. County of Westchester,* 686 F.Supp. 1044 (S.D.N.Y.1988)). Congress has taken steps to expressly "recognize, preserve and protect the primary responsibility and rights of the States to prevent, reduce and eliminate pollution." 33 U.S.C. § 125 1(b); *North & South Rivers Watershed Ass'n v. Scituate,* 949 F.2d 552, 555 (1st Cir.1991).

■ Before reaching the merits of Williams' and Bayer's statutory claims, the Court must apply the criteria set forth in subsection 309(g) to determine whether Bay-

er's CWA action is jurisdictionally barred. Specifically, the Court must determine, (1) whether DNR has commenced and is diligently prosecuting an enforcement action against Williams under a state law comparable to subsection 309(g); and (2) if so, whether the violations Bayer alleges are within the scope of that action. The burden of proving subject matter jurisdiction rests on the party asserting the claim. *See, e.g., Hoekel v. Plumbing Planning Corp.,* 20 F.3d 839, 840 (8th Cir.), *cert. denied,* 513 U.S. 974, 115 S.Ct. 448, 130 L.Ed.2d 358 (1994).

Bayer maintains this Court has jurisdiction, because DNR had not commenced and was not diligently prosecuting an enforcement action against Williams for a violation of the CWA. Bayer contends the state's issuance of an NPDES permit to Williams does not amount to an enforcement action for purposes of subsection 309, and the mere fact that Williams has a permit does not constitute a jurisdictional bar.

Williams asserts this Court does not have jurisdiction, because DNR has commenced the equivalent of an enforcement action against Williams for a violation of the CWA and was diligently prosecuting the action.

### 1) *Violation*

The CWA prohibits the unpermitted discharge by any person of any pollutant into navigable waters in the absence of an NPDES permit. *Gwaltney,* 484 U.S. at 52, 108 S.Ct. at 378–79; *Hughey,* 78 F.3d at 1525, 33 U.S.C. § 1311(a). To establish a CWA violation, plaintiffs must show the discharge of pollutants into navigable waters from a "point source." 33 U.S.C. §§ 1311(a), 1362(12); *Concerned Area Residents for Env't v. Southview Farm,* 834 F.Supp. 1410, 1417 (W.D.N.Y.1993).

■ Whether a discharge occurred from a point source is a question of fact. *Concerned Area Residents,* 834 F.Supp. at 1417 (citations omitted). The CWA defines "point source" as any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel

or other floating craft, from which pollutants are or may be discharged. 33 U.S.C. § 1362(14); *Missouri v. Department of the Army,* 672 F.2d 1297, 1303–04 (8th Cir.1982). "The definition of a point source is to be broadly interpreted." *Dague v. City of Burlington,* 935 F.2d 1343, 1354 (2d Cir.1991) (quoting *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir.1979)), *rev'd on other grounds by* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

■ An entire facility or industrial plant may be a point source. *See Concerned Area Residents,* 834 F.Supp. at 1418–19 (denying defendant farmer's motion for summary judgment in CWA claim; holding material issues of fact existed concerning whether farm was a point source, where pollutants were conveyed by farmer's manure-spreading activity and plowed furrows into navigable waters, and where discharges occurred from distinct sources, including a broken pipe and a truck, when discharges could have been more than isolated and transient incidents); *Mahelona v. Hawaiian Elec. Co.,* 418 F.Supp. 1328, 1335 (D.Haw.1976) (stating electric generating plant was source of pollution under CWA,[16] but discharge facility was proposed method of control and therefore could not also be source).

"Discharges" include spilling and leaking. 33 U.S.C. § 1321(2); *see. e.g.. United States v. Texas Pipe Line Co.,* 611 F.2d 345, 347 (10th Cir.1979) (holding spill from oil pipeline into waters of unnamed tributary violated CWA). "Discharge," however, does not include the following:

(B) discharges resulting from circumstances identified and reviewed and made a part of the public record with respect to a permit issued or modified under section 1342 of this title, and subject to a condition in such permit, and (C) continuous or anticipated intermittent discharges from a point source, identified in a permit or permit application under section 1342 ... which are caused by events occurring within the scope of relevant operating or treatment systems.

33 U.S.C. § 1321(2)(B) & (C).

Wetlands are navigable waters for purposes of the CWA. *See* 33 U.S.C. 1362(7) (defining "navigable waters" to mean "waters of the United States"); 40 CFR 122.2 (defining "waters of the United States" to include wetlands).

Whether the legal concept of navigable waters includes groundwaters connected to surface waters is an unresolved question. *Inland Steel Co. v. Envtl. Protection Agency,* 901 F.2d 1419, 1422 (7th Cir.1990) (stating in dicta that a well that ended in groundwaters connected to navigable waters might be within scope of CWA) (citations omitted); *Washington Wilderness Coalition v. Hecla Mining Co.,* 870 F.Supp. 983, 990 (.D.Wash.1994) (citations omitted) (noting courts are split on the issue of whether tributary groundwater that is naturally connected to surface water is subject to CWA; reviewing authorities and holding any pollutant that enters surface waters through groundwater is subject to regulation by NPDES permit). Some courts have held that CWA's regulations do not assert authority over groundwaters based on the mere possibility the groundwaters might be hydrologically connected to surface waters. *Village of Oconomowoc Lake v. Dayton Hudson Corp.,* 24 F.3d 962, 965 (7th Cir.), *cert. denied,* 513 U.S. 930, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994); *Kelley v. United States,* 618 F.Supp. 1103, 1106–07 (W.D.Mich.1985). The majority of courts have held that groundwaters that are hydrologically connected to surface waters are regulated waters of the United States, and that unpermitted discharges into such groundwaters are prohibited under section 1311. *Friends of Santa Fe County v. LAC Minerals, Inc.,* 892 F.Supp. 1333, 1358 (D.N.M. 1995) (citations omitted).

■ The Eighth Circuit has not addressed the issue. This Court finds persuasive the reasoning in *Washington Wilderness Coalition,* 870 F.Supp. 983, and the cases cited by that court. Because the CWA's goal is to

16. "Source" is defined as "Any building, structure, facility, or installation from which there is or may be the discharge of pollutants." 33 U.S.C. § 1316(a)(3).

protect the quality of surface waters, the NPDES permit system regulates any pollutants that enter such waters either directly or through groundwater. *See id.* at 990.

■ Here, Williams operates a facility on which the operation of above-ground tanks has resulted in spills and leaks, which have been more than isolated and transient incidents. The evidence shows that before 1985, a series of spills, leaks and other releases occurred at the Williams site. The record also shows that at least by 1981 to 1982, spilled oil on the site was released into the swamp. Bayer asserts, and Williams does not deny, that the swamp is a wetland. Based on the evidence, including DNR officials' use of the term wetland in describing the swamp area, the Court finds the swamp is a wetland area. The court holds that the Williams facility is a point source from which discharges of pollution occur.

■ The discharges from the Williams site resulted in pollution entering the groundwater. Evidence submitted in reports on the record show the groundwater at the site moves south and southwest toward both the wetland swamp area and the Des Moines River. Based on Leggette's reports concerning direction of groundwater movement at the Williams site, the Court finds the groundwater under the Williams site is hydrologically connected to surface waters, including the Des Moines River and the wetland swamp. The facts of this case present more than the mere possibility that pollutants discharged into groundwater will enter "waters of the United States." The Court holds therefore that a violation existed; the unpermitted discharges of pollutants through spills, leaks, and other releases into the groundwater and into the wetland area at the Williams site before Williams obtained its NPDES permit violated the CWA, and an ongoing violation would exist today if Williams were not operating a remediation system under the direction of DNR.

### 2) *Commence an Action*

As noted above, citizens suits are barred only where the state has brought an action under a state law comparable to subsection 309(g). *See* 33 U.S.C. 1319(g)(6)( ii); *Arkansas Wildlife,* 29 F.3d at 378–79 n. 3; *Scituate,* 949 F.2d at 555.

Bayer contends that DNR has not commenced an enforcement action against Williams for violation of the CWA. The only action DNR has taken under the CWA, Bayer argues, is issuance of the NPDES permit, and such action constitutes regulation, not enforcement.

Here, the state's enforcement effort included directing Williams to investigate and remediate,[17] and reaching a settlement that included Williams' designing and implementing of a remediation plan, obtaining an NPDES permit, complying with permit conditions, and submitting annual and then quarterly status reports, and included DNR's site inspections. The parties have not cited, and the Court has not found, any case analyzing whether such corrective actions such as DNR took in this case include commencing an "action" for purposes of subsection 309(g).

The CWA does not define "commencement." *Sierra Club v. Colorado Refining Co.,* 852 F.Supp. 1476, 1484 (D.Colo.1994). To determine the meaning of "commencement," the *Sierra Club* court turned for guidance to the relevant state act's specific procedures for the institution of enforcement proceedings. *Id.* at 1484 (adopting approach of *Public Interest Research Group of New Jersey, Inc. v. Elf Atochem North America, Inc.,* 817 F.Supp. 1164, 1172 (D.N.J.1993)). Iowa's procedures for the institution of enforcement proceedings provide that DNR's director shall, "Take any action or actions allowed by law which, in the director's judgment are necessary to enforce or secure compliance with the provisions of this part of this division or of any rule or standard established or permit issued pursuant thereto." Iowa Code § 455B. 174(3) (1995). When substantial evidence shows a person has vio-

---

**17.** The record does not indicate the form of these directives, whether they were written or oral, or their specific content.

lated a provision, rule, standard or permit, the director, "may issue an order directing the person to desist ... or to take such corrective action as may be necessary to ensure that the violation will cease." Iowa Code § 455B. 175(1) (1995) (emphasis added). Iowa law gives DNR's director discretion to choose the commencement method and corrective action deemed most effective under the circumstances to ensure a violation ceases.

▉▉▉ The CWA also does not define "action." Under subsection 309(g), "action" does not mean a lawsuit. *Sierra Club*, 852 F.Supp. at 1483. While 33 U.S.C. § 1365(b)(1)(B) bars a citizen suit if the state "has commenced or is diligently prosecuting a civil or criminal action in a court," subsection 309(g) refers only to prosecution of "an action under a State law comparable to this subsection;" the phrase "in a court" is not found in subsection 309(g). *Id.* at 1484; *Connecticut Coastal*, 777 F.Supp. at 181; *accord Scituate*, 949 F.2d at 555–56 (citizen suit is barred even when a state is not prosecuting a penalty action, but only a compliance action). Nor is any phrase such as "an administrative proceeding" or "formal administrative action" found in subsection 309(g).[18]

When determining whether states have commenced an action within the meaning of subsection 309(g), the Eighth Circuit has held that states "are afforded some latitude in selecting the specific mechanisms of their enforcement program." *Arkansas Wildlife*, 29 F.3d at 380 (stating as long as state's laws authorized penalty assessments, citizens suit was precluded even if state chose not to use penalty assessments in specific instance). The *Arkansas Wildlife* court held that Arkansas' issuing of an administrative order to a manufacturer with the manufacturer's consent, rather than issuing a Notice of Violation, constituted commencing an action with-

in the meaning of subsection 309(g). *Id.* The court noted that after the administrative consent order was issued, third parties could intervene, and certain notice and hearing procedures became available to third parties. *Id.* Moreover, once the manufacturer consented to the order, it became subject to further penalties for failure to comply with the order. *Id.*

Iowa courts recognize that DNR can reach a negotiated settlement agreement with a violator without entering a formal consent order. *See Blue Chip Enter. v. Dep't of Natural Resources*, 528 N.W.2d 619, 624 (Iowa 1995) (stating in dicta that administrative law judge could have found a settlement agreement existed based on memorandum referencing negotiated remedial action, the remedial action taken by company, and the fact agency took no further action with respect to company for six years). In general, Iowa courts recognize a person's right to waive his or her due process right to a hearing. *See, e.g., In re Marriage of Seyler*, 559 N.W.2d 7, 10 n. 1 (Iowa 1997); *Messina v. Iowa Dep't of Job Service*, 341 N.W.2d 52, 60 (Iowa 1983).

▉▉▉ Settling with a violator is within a government agency's discretion, even though citizens might have preferred more stringent terms than those worked out by the government. *Green Forest*, 921 F.2d at 1403 (approving dismissal of a citizen suit filed before a regulatory agency reached an out-of-court settlement with the violator; recognizing preeminent role government plays in CWA enforcement scheme); *accord, Rueth v. United States Envtl. Protection Agency*, 13 F.3d 227, 230 (7th Cir.1993) (holding EPA had discretion to issue final order or to seek administrative penalties; court lacked jurisdiction under CWA to review preenforcement actions). The CWA "was not intended to

---

18. Iowa's Administrative Procedure Act (IAPA) defines agency action broadly to include rulemaking; adjudication, some of which must be by contested case procedure; and the performance of any other agency duties, sometimes referred to as "other agency action." *Sindlinger v. Iowa State Bd. of Regents*, 503 N.W.2d 387, 389 (Iowa 1993); *Allegre v. Iowa State Bd. of Regents*, 349 N.W.2d 112, 114 (Iowa 1984); Iowa Code § 17A.2(2) (1995). Agency action, including

"other agency action," is subject to judicial review under the IAPA. *See Upper Iowa River Preservation Ass'n v. Iowa Natural Resource Comm'n*, 497 N.W.2d 865, 868 (Iowa 1993) (holding Natural Resource Commission's administrative activity in designating Upper Iowa River as protected water area and adopting management plan was "other agency action" subject to judicial review); Iowa Code § 17A. 19 (1995).

enable citizens to commandeer the federal enforcement machinery." *Id.* (quoting *Dubois v. Thomas,* 820 F.2d 943 (8th Cir.1987)). In the following example, the Supreme Court underscored the importance of not curtailing the government's discretion:

> Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a). Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit . . . in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The same might be said of the discretion of state enforcement authorities.

*Gwaltney,* 484 U.S. at 60–61, 108 S.Ct. at 383. "An Administrator unable to make concessions is unable to obtain them," and a private plaintiff then becomes "captain of the litigation." *Supporters to Oppose Pollution v. Heritage Group,* 973 F.2d 1320, 1324 (7th Cir.1992).

In this case, the interests of third parties are protected by notice and hearing procedures, as discussed below. Third parties have access to DNR's public records concerning the Williams site. See 567 Iowa Admin. Code 64.5(6).

When DNR directed Williams to engage environmental consultants to investigate the existence and extent of pollution on the site, Williams complied. After investigations showed the magnitude of pollution, including contamination on the Bayer site, DNR directed Williams to take remedial steps under DNR's supervision, Williams again complied. DNR had the authority to assess financial penalties for Williams' CWA violations but chose instead to require compliance and negotiate a settlement without assessing penalties. Because Williams complied with DNR's directives, DNR did not have to file an administrative order or a Notice of Violation to begin administrative proceedings. Compli-

ance was at hand. Williams had the right to comply or, if it chose not to comply, assert its right to a hearing after DNR issued a formal order or assessed penalties.

DNR approved the remediation plan it directed Williams to submit, and the state set permit conditions, including monitoring of wells on Bayer's property, and issued Williams an NPDES permit to implement the plan. Clemens testified that Williams' actions in obtaining the NPDES permit were part of Williams' remediation and cleanup activity at the site. (Ex. 82, Clemens Dep. at 49.) Contrary to Bayer's assertion, the conditions in the NPDES permit thus were part of DNR's enforcement effort. Syntex Agribusiness, the previous owner of the Bayer site, did not take advantage of the opportunity to submit written views or participate in a public hearing concerning the issuance or conditions of the first proposed NPDES permit. Neither Diamond Scientific nor Agrion submitted written views or participated in a public hearing concerning the reissuance of Williams' NPDES permit in 1989. Neither Diamond Scientific nor Miles submitted written views or participated in a public hearing concerning the reissuance of the NPDES permit in 1994. Before Williams' permit is renewed in 1999, the owner of Bayer's property will have the opportunity to submit written views or participate in a public hearing concerning the reissuance.

As with the manufacturer in *Arkansas Wildlife,* once Williams complied by devising a remediation plan, including obtaining an NPDES permit, the company became subject to further penalties for failure to comply with the ordered remediation.

■ Affording the state some latitude in selecting the specific mechanism of its enforcement program, the Court holds that a citizens suit may be barred even absent formal administrative proceedings where, as discussed below, the state has authority to issue orders and assess penalties for violations but chooses instead to order compliance and settle informally with the violator; the interests of third parties are protected by notice and hearing procedures; and the violator is subject to further penalties for failure to comply with the remediation plan.

██ Given the Court's findings and the case law disfavoring citizens suits where the enforcement is proceeding according to state law, the Court holds that DNR commenced an action for purposes of subsection 309(g), where the action included issuing directives and reaching an informal settlement that involved a remediation plan, an NPDES permit, monitoring, status reports, and site investigations. DNR took "such corrective action as may be deemed necessary" to insure the violation ceased. See Iowa Code § 455B.175(1).

### 3) Comparable to Subsection 309(g )

██ The statutory bar to citizen suits focuses "not on state statutory construction, but on whether corrective action already taken and diligently pursued by the government seeks to remedy the same violations as duplicative civilian action." *Arkansas Wildlife*, 29 F.3d at 381 (quoting *Scituate*, 949 F.2d at 557). The comparability requirement may be satisfied as long as the state's law "contains comparable penalty provisions which the state is authorized to enforce, has the same overall enforcement goals as the federal CWA, provides interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguards their legitimate substantive interests." *Arkansas Wildlife*, 29 F.3d at 381. Citizen suits are barred where a state agency conducting enforcement proceedings has the authority to assess financial penalties, regardless of whether the agency actually assesses or seeks penalties. *Connecticut Coastal*, 777 F.Supp. at 181. Under these circumstances, a court should presume the state statute is comparable unless the facts of the case show the state denied an interested party a meaningful opportunity to participate in the administrative enforcement process. *Arkansas Wildlife*, 29 F.3d at 382.

In this case, the parties have pointed to no dissimilarities between the CWA and Iowa law. Iowa law provides penalty provisions that the state is authorized to enforce,[19] and both the CWA and Iowa state laws have the goal of eliminating pollution through penalty provisions including civil and criminal sanctions and administrative penalties.[20] *Arkansas Wildlife*, 29 F.3d at 381. Iowa state law provides interested citizens meaningful opportunities to participate at significant stages of the decision-making process.[21] The state law adequately safeguards citizens' legitimate substantive interests.[22] See *Arkansas Wildlife*, 29 F.3d at 381.

The facts of the case do not show the state denied Bayer or its predecessors a meaningful opportunity to participate in the administrative enforcement process, or that if Bayer had tried to participate, the state would have denied the company any such opportunity.

██ Iowa law has penalty provisions comparable to the CWA, which the state is authorized to enforce, has the same overall enforcement goals as the federal CWA, provides interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguards their legitimate substantive interests. Under these circumstances, the Court holds the state statute is comparable, and holds that the state has commenced an action under a state law comparable to subsection 309(g).

---

**19.** *See* Iowa Code §§ 455B. 175 (violations), 455B.182 (providing for contempt order and penalty fines), 455B. 186 (prohibited actions).

**20.** The Iowa general assembly has made the following declaration of policy:
> ... [B]ecause the federal Water Pollution Control Act [CWA], provides for a permit system to regulate the discharge of pollutants into the waters of the United States and provides that permits may be issued by states which are authorized to implement that Act, it is in the interest of the people of Iowa to enact this Act in order to authorize the state to implement the federal Water Pollution Control Act, and federal regulations and guidelines issued pursuant to that Act.
Iowa Code § 455B.178 (1995).

**21.** *See* Iowa Code § 455B.174(4)(b) (notice, public hearing); 567 Iowa Admin. Code 64.5(2)(b) (written comments) (renumbered from 900 Iowa Admin. Code 64.5(2)(b)); and 567 Iowa Admin. Code 64.5(6) & (7) (public hearing) (renumbered from 900 Iowa Admin. Code 64.5(6) & (7)).

**22.** *See* Iowa Code §§ 455B.178 (judicial review), 455B.308 (appeal from order).

### 4) Diligent Prosecution

█ The plaintiff in a citizens suit bears the burden of proving the state agency's prosecution was not diligent. *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC)*, 890 F.Supp. 470, 486–87 (D.S.C.1995). The burden is heavy, because the enforcement agency's diligence is presumed. *Id.* at 487. "[T]he state [enforcement] agency must be given great deference to proceed in a manner it considers in the best interests of all parties involved." *Arkansas Wildlife v. ICI Americas, Inc.*, 842 F.Supp. 1140, 1147 (E.D.Ark. 1993), *aff'd*, 29 F.3d 376 (8th Cir.1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1094, 130 L.Ed.2d 1062 (1995). The CWA's thrust is to "provide *society* with a remedy against polluters in the interest of protecting the environment." *Connecticut Coastal*, 777 F.Supp. at 184 (emphasis in original). If the agency's action achieves that goal, the fact that any private attorney general is barred from duplicating that effort should hardly seem harsh. *Id.*

█ Diligent prosecution is not limited to ordering compliance with the CWA by a date certain, according to a timetable, and providing civil penalties for violations. *Id.* at 185. Rather, the CWA "calls for a more deferential approach that does not circumscribe the administrator's discretion" to implement corrective steps that, in his expert judgment, adequately address a violation. *Id.* The government agency is not required to succeed by the private party's definition of success. *Supporters to Oppose Pollution*, 973 F.2d at 1324 (applying same standard under RCRA: "The statute does not require that the EPA succeed; it requires only that the EPA *try*, diligently."). (Emphasis in original.) Merely because a state may not be taking the precise action a private plaintiff wants it to, or moving with the speed the plaintiff desires, does not entitle the private plaintiff to injunctive relief Scituate, 949 F.2d at 558.

In this case, government enforcement action is currently underway relating back at least to 1983, when DNR directed Williams to submit a remediation plan. *See Gwaltney*, 484 U.S. at 60, 108 S.Ct. at 382–83. DNR monitors Williams' progress in remediation through analysis of Williams' annual reports and monthly operating reports. Before 1991, whenever DNR directed Williams to submit a status report, Williams complied. Since 1991, when Grgurich directed Williams to supply DNR with an annual status report until the site was cleaned up, Williams has complied. In addition, each year, as part of its reporting requirements under the NPDES permit, Williams must complete the form titled "Report of Water Use by Regulated Users," showing the amount of water used each month for RW-1. *See* Ex. CL, Ex. 18 at 2, 15.

The record indicates that DNR prepares a Report of Investigation on the Williams site every two years.[23] When Grgurich discovered in the course of working on the 1992 report that Williams had failed to submit monthly operating reports to DNR for a two-year period, DNR notified Williams that it was in violation of its permit, and that it needed to begin collecting samples from monitoring wells on Williams' and Bayer's property immediately. Williams responded promptly by submitting the data, which it had collected, but not supplied, to DNR.

Clemens testified that Williams installed an aeration device in the swamp in response to DNR's directive, and has been cooperative in answering DNR's requests for information.

Williams provided the state with reports concerning spills on its property. For example, in March 1986, Williams discovered a spill and leakage from tank No. 620 totaling between 196 and 280 barrels. Ex. CF at 2. Leggette prepared a Report of Hydrogeologic Investigation for the tank spill, including analysis of the extent of contamination, recovery operations, and recommendations, and Williams submitted the report to Grgurich. *See* Ex. CF.

---

**23.** The Court notes enforcement would be more vigorous if DNR prepared Reports of Investigation more frequently than every two years. The Court cannot conclude, however, that preparation of such reports every two years is substantial evidence that the agency's prosecution was not diligent.

The record does not indicate, and Bayer does not allege, that between 1989 and the filing of this action, Williams violated the conditions of the permit by exceeding effluent limitations on any of the pollutants covered. Bayer does not contend any information in Williams' compliance reports is erroneous, or that the reports contain sampling errors.

No representative of Bayer or its predecessor ever asked DNR to take action to compel Williams to clean up the contamination on Bayer's property.

■ While remediation of the site may be slow, progress is being made and DNR is trying diligently. The Court holds DNR is diligently prosecuting an action against Williams for purposes of subsection 309(g), and the Iowa law under which DNR is proceeding is comparable to subsection 309(g). Bayer may prefer a more vigorous enforcement and remediation program, but the Court does not reject DNR's actions under the diligent prosecution standard.

Having determined that DNR has commenced, and is diligently prosecuting, an enforcement action against Williams under a state law comparable to subsection 309(g), the Court will analyze whether the violations Bayer alleges are within the scope of that action.

### b. Alleged Violations within Scope

Bayer asserts two claims for violation of the CWA: (1) the unpermitted discharge from RW–1 to the surface impoundment, the wetland swamp, a water of the United States; and (2) the unpermitted discharge, through seepage or leaching, of pollutants in the swamp, to groundwater that reaches the Des Moines River after the swamp was used to hold polluted groundwater recovered by RW–1.

### 1) Discharge to Swamp

Bayer claims that Williams' NPDES permit regulates only the discharge from the swamp to outfall No. 001, not the discharge of pollutants into the swamp itself, and that Williams is thus violating the CWA by discharging a pollutant into a water of the United States without a permit regulating its discharge. Williams asserts its permit covered its entire remediation system, including discharges from RW–1 to the swamp, and discharges from the swamp to waters flowing into the Des Moines River.

■ Interpretation of the meaning of provisions of an NPDES permit is a matter of law for a court to determine. *United States v. Weitzenhoff,* 35 F.3d 1275, 1287 (9th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 939, 130 L.Ed.2d 884 (1995); *see generally United States v. City of Toledo,* 867 F.Supp. 598, 601 (N.D.Ohio 1994); *California Public Interest Research Group v. Shell* Oil Co., 840 F.Supp. 712, 716 (N.D.Cal.1993); *Natural Resources Defense Council, Inc. v. Outboard Marine Corp.,* 692 F.Supp. 801, 818 (N.D.Ill.1988). As noted in Section I, the permit's sampling and reporting requirements refer to discharges to the swamp. The Court therefore holds that Williams' current NPDES permit authorizes discharges from RW–I to the swamp.

An implied issue Bayer raises is that the permit is not sufficiently strict, in that it does not set an outfall location and effluent limitation standards for discharges to the swamp, as it does for discharges from the swamp to the river.

The so-called "shield provision" in section 402(k) defines compliance with an NPDES permit, including a state-issued permit, as compliance with section 301 for purposes of CWA's enforcement provisions. 33 U.S.C. § 1342(k); *Atlantic States Legal Found. v. Eastman Kodak Co.,* 12 F.3d 353, 357 (2d Cir.1993), *cert. denied,* 513 U.S. 811, 115 S.Ct. 62, 130 L.Ed.2d 19 (1994). "The purpose of § 402(k) seems to be to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict." *E.I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138 n. 28, 97 S.Ct. 965, 980 n. 28, 51 L.Ed.2d 204 (1977); *Atlantic States,* 12 F.3d at 357 (holding private groups could not bring citizens suit action to stop discharge of pollutants not listed in valid permit issued pursuant to CWA, because discharge of unlisted

pollutants was not unlawful under CWA). Section 402(k) gives permits finality. *Train,* 430 U.S. at 138 n. 28, 97 S.Ct. at 980 n. 28.

 Treatment at the swamp is part of the remediation system. The system's design assumes that water discharged into the swamp requires treatment. DNR does not require the water to meet established effluent limitation standards at the time it is discharged into the swamp. DNR is entitled to use its expertise in pollution control in setting outfall locations and quantities, and effluent limitations as permit conditions. *See generally United States Steel Corp. v. Train,* 556 F.2d 822, 842 (7th Cir.1977). The Court holds that Williams' NPDES permit is valid. Therefore, under the shield provision in section 402(k), Williams' compliance with its permit constitutes compliance with section 301 for purposes of CWA's enforcement provisions.

Because the permit's sampling and reporting requirements cover the discharge to the swamp as well as from the swamp, the Court holds that this alleged violation is within the scope of the action that DNR has commenced and is diligently prosecuting; thus Williams is not violating the CWA by discharging a pollutant into a water of the United States without a permit regulating its discharge.

### 2) Seepage from Swamp

Bayer alleges that Williams' NPDES permit does not cover the seepage of pollutants from the swamp, a point source, into the groundwater, which reaches the Des Moines River at a location other than that permitted in the permit. Williams, Bayer argues, is therefore violating the CWA by discharging a pollutant into a water of the United States without a permit regulating its discharge. Williams asserts (1) discharges into groundwater are not covered by the CWA; and (2) even if such seepages are prohibited by the CWA, any seepage in this case was anticipated by the state and is thus included in effluent standards mandated in Williams' NPDES permit.

The CWA prohibits the discharge of a pollutant into the waters of the United States from a point source without a permit. *Friends of Santa Fe Co. v. LAC Minerals, Inc.,* 892 F.Supp. 1333, 1352 (D.N.M.1995). Bayer is apparently arguing that the swamp, not the seepages, is the point source [24] from which discharges into the groundwater are occurring, and that although Williams has a permit covering discharges from the swamp at outfall No. 001, it needs another permit covering discharges from the swamp through seepages. In other words, a separate permit is needed for each discrete discharge location from a point source.

 Bayer has not cited, nor can the Court find, any CWA provision or any case law to support this assertion. Bayer's proposed construction of the CWA would lead to an intolerable outcome. *See generally, Hughey,* 78 F.3d at 1529 (citing *United States v. X–Citement Video, Inc.,* 513 U.S. 64, 69–71, 115 S.Ct. 464, 468, 130 L.Ed.2d 372 (1994)) (noting when interpreting liability provisions of CWA, courts should recognize Congress "is presumed not to have intended absurd (impossible) results"); *United States v. GAF Corp.,* 389 F.Supp. 1379, 1386 (S.D.Tex.1975). To require a separate permit for each outfall at the swamp would be an unreasonable requirement and plainly at variance with the policy of the legislation as a whole. Apparently, Bayer is confusing outfall locations with a point source requiring a permit. Under the facts of this case, where Williams already has a permit covering discharge from the swamp, the Court holds Congress did not intend for seepages from the swamp to require a separate permit.

Alternatively, Bayer's implicit argument is that Williams' NPDES permit was incomplete and not sufficiently strict, because it did not list all the discharge locations from the swamp, including seepages. At trial, Bayer produced no evidence showing significant amounts of seepage from the swamp. No evidence showed the alleged seepage posed any significant risk of contamination, or that the effluent levels in the seepage

---

**24.** At least one court has determined that seepages, where a defendant has nothing to do with their creation, are non-point sources similar to storm water, and therefore are not subject to CWA's permitting requirements. *Friends of Santa Fe Co.,* 892 F.Supp. at 1352.

exceeded the effluent limitations established in Williams' permit.

■ Williams' permit includes use of the swamp as part of the treatment system, and the permit governs discharges from the swamp. No evidence at trial showed DNR failed to take seepage into consideration in setting effluent limitations for discharges from the swamp. The Court finds that DNR took all aspects of the swamp into account, including the possibility of minimal seepage, when issuing the permit. DNR is entitled to use its expertise in pollution control in setting outfall locations and effluent limitations as permit conditions. *See generally, United States Steel Corp.*, 556 F.2d at 842. The Court holds that Williams' NPDES permit is valid. Therefore, under the shield provision in section 402(k), Williams' compliance with its permit constitutes compliance with Section 301 for purposes of CWA's enforcement provisions. *See Train*, 430 U.S. at 138 n. 28, 97 S.Ct. at 980 n. 28; *Atlantic States*, 12 F.3d at 357.

■ The Court holds that this alleged violation is within the scope of the action that DNR has commenced and diligently prosecuting,[25] and thus Williams is not violating the CWA by discharging a pollutant into a water of the United States without a permit regulating its discharge.[26]

#### c. Conclusion

The Court does not have jurisdiction over Bayer's CWA citizen suit because DNR commenced and was diligently prosecuting an action under an Iowa law comparable to U.S.C. § 1319(g), and because the violations Bayer alleges are within the scope of that action. Because of its holding, the Court

does not address Williams' affirmative defenses.

### B. Resource Conservation and Recovery Act Claim

The statute under which Bayer invokes federal court jurisdiction is RCRA's citizen suit provision, 42 U.S.C. § 6972(a) (1995), which reads in pertinent part as follows:

> Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—
>
> (1)(a) against any person ( ... ) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter.

42 U.S.C. § 6972(a)(1)(B); *Furrer v. Brown*, 62 F.3d 1092, 1098 (8th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1567, 134 L.Ed.2d 667 (1996).

Bayer alleges that Williams has violated 42 U.S.C. § 6925(a), which addresses permit requirements under RCRA, in two respects: (1) through spills and leaks of hazardous waste, including petroleum hydrocarbons, into the soil and groundwater without a permit; and (2) recovering contaminated groundwater and placing the water in a surface impoundment for disposal without a permit.

#### 1. Spills and Leaks Without a Permit

Bayer asserts that Williams has violated 42 U.S.C. § 6925(a) by leaking and spilling petroleum hydrocarbons on the ground from above-ground storage tanks without a RCRA permit. Specifically, Bayer argues that the involuntary leaks and spills of petroleum at Williams' facility violate section 6925(a), in that (1) the petroleum is a hazardous waste because it fails the toxicity test set forth in

---

**25.** The Court notes that any alleged seepage of pollutants from the swamp into groundwater would have occurred before the swamp was used to hold groundwater recovered by RW–1. The record shows that beginning at least in 1981 or 1982, Williams used the swamp to gather and clean spilled oil on the site, and that sludge from that period remains in the swamp. Bayer's attempt to secure the Court's jurisdiction by arguing its claim relates only to the period following installation of RW–1, the period of a new alleged violation, must therefore fail.

**26.** Alternatively, the Court holds that Bayer does not have standing to bring this claim in view of the Court's findings that the swamp is not hydrologically connected to Bayer's property, and that any contamination that has reached the Des Moines River through groundwater carrying seepage from the swamp has not contaminated Williams' property. *See Defenders of Wildlife v. Hodel*, 851 F.2d 1035, 1038–39 (8th Cir.1988).

40 CFR 261.2, and (2) the leaks and spills, although involuntary acts, comprise disposal of a pollutant on soil and groundwater without a RCRA permit.

Williams contends (1) that Bayer lacks standing to assert its RCRA claims; (2) that Williams is not disposing of hazardous waste as defined in the RCRA for purposes of Section 3005(a); and (3) that Williams is not a hazardous waste disposal facility.

Section 3005(a) of the RCRA generally prohibits the operation of hazardous waste management facilities or units, unless under a RCRA permit that specifies the conditions for management, or unless in compliance with interim status requirements. *United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 864 (7th Cir.1994); *Thermalkem, Inc. v. United States Envtl. Protection Agency*, 25 F.3d 1233, 1234–35 (3d Cir.1994); 42 U.S.C. § 6925(a); *accord American Petroleum Inst. v. United States Envtl. Protection Agency*, 906 F.2d 729, 733 (D.C.Cir.1990).

■ For a defendant to be subject to RCRA's permit requirements under section 3005(a), the petroleum leaked and spilled by the defendant must constitute hazardous waste. *Connecticut Coastal*, 989 F.2d at 1313. To classify as a hazardous waste, the waste must first qualify as a discarded solid waste. *Id.* at 1313; *see* 42 U.S.C. § 6903(5). "Solid waste" is defined as "any ... discarded material." 42 U.S.C. § 6903(27). Although RCRA does not define "discarded material," regulations governing the Act define the term as any material abandoned by being disposed of, burned or incinerated; or by being accumulated, stored, or treated before or in lieu of being thus abandoned. 40 C.F.R. §§ 261.2(a)(2)(i), 261.2(b). The statute defines "disposal" as the following:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment....

42 U.S.C. § 6903(3). Several courts have observed that definitions become circular, and "solid waste is defined as the leaking of any solid waste." *Dydio v. Hesston Corp.*,

887 F.Supp. 1037, 1048 (N.D.Ill.1995) (citations omitted).

"Solid waste" does not include " 'solid or dissolved materials in ... industrial discharges which are point sources subject to permits under' section 1342 of the Clean Water Act...." *See* 42 U.S.C. § 6903(27); 40 C.F.R. § 261.4(a)(2); *Inland Steel*, 901 F.2d at 1421; *Lutz v. Chromatex, Inc.*, 725 F.Supp. 258, 263 (M.D.Pa.1989).

■ This exclusion, however, generally applies only to an "actual point source discharge," and does not exclude "industrial wastewaters while they are being collected, stored or treated before discharge, nor does it exclude sludges that are generated by industrial wastewater treatment." 40 C.F.R. § 261.4(a)(2) (comment); *United States v. Allegan Metal Finishing Co.*, 696 F.Supp. 275, 281 (W.D.Mich.1988) (holding that holding-pond sludge was subject to RCRA regulation, even allowing that defendant discharged wastewater from its facility under NPDES permit, where defendant dredged sludge from ponds, dried it on banks, and transported sludge to licensed off-site disposal facility). The purpose of the exclusion, "is to avoid duplicative regulation, not to create a regulatory hole through which billions of gallons of hazardous wastes can be pumped into the earth without any controls." *Inland Steel*, 901 F.2d at 1423.

When DNR directed Williams to investigate and remediate pollution from spills, leaks and other releases on its site, the object was abatement and remediation of pollution to prevent the migration of hazardous constituents from the Williams site, and to insure that the waste was treated to meet federal standards, including the provision of notice and opportunity for hearings, and the promulgation of conditions specifying levels or methods of treatment to substantially diminish the toxicity of the waste. Under these circumstances, a conclusion that the spills and leaks were not subject to RCRA because they were subject to an NPDES permit would avoid duplicative regulation, not create a regulatory hole.

■ The spills and leaks are industrial discharges from the Williams facility, a point

source, and are subject to an NPDES permit. The spills and leaks thus are excluded from the definition of "solid waste" under 42 U.S.C. § 6903(27).[27]

The Court holds that the petroleum leaked and spilled does not constitute a hazardous waste, the discharge of which is prohibited without a permit under section 3005(a) of the RCRA.[28] The Court therefore does not have jurisdiction over this claim.

### 2. Placing Groundwater in Surface Impoundment

Bayer next contends that Williams needs a RCRA permit allowing it to recover contaminated groundwater and place the water in a surface impoundment, the swamp, for disposal.

 The Court found above that the swamp is not hydrologically connected to Bayer's property, and that no contamination from the alleged swamp seepage pollutes Bayer's property. The Court also found that any contamination that reached the Des Moines River through groundwater carrying seepage from the swamp did not contaminate Bayer's property. The Court therefore finds that Bayer does not have standing to assert this claim. *See Defenders of Wildlife v. Hodel*, 851 F.2d 1035, 1038–39 (8th Cir.1988).

### C. Iowa Code Ch. 455B Claim

Bayer brings a citizens suit under Iowa Code § 455B.111, alleging that Williams violated Iowa Code §§ 455B.186(1), which states as follows:

A pollutant shall not be disposed of by dumping, depositing, or discharging such pollutant into any water of the state, except that this section shall not be construed to prohibit the discharge of adequately treated sewage, industrial waste, or other waste pursuant to a permit issued by the director.

Iowa Code §§ 455B. 186(1).

Iowa Code § 455B. 111 disallows a citizen suit if the DNR or the state "has commenced and is actively prosecuting a civil action or is actively negotiating an out-of-court settlement to require abatement of the violation and, if necessary, remediation of damages." Iowa Code § 455B.111. As noted above, the EPA authorized the State of Iowa to create and administer its own NPDES system. *Ames*, 986 F.2d at 255.

 For the reasons discussed above in the section on the CWA, the Court holds that DNR "has commenced and is actively prosecuting a civil action or is actively negotiating an out-of-court settlement to require abatement of the violation and, if necessary, remediation of damages," and that Bayer's chapter 455B claims are included within the scope of that action or negotiation. Therefore, the Court does not have jurisdiction over this claim.[29]

### D. State Tort Claims

Bayer asserts state tort claims under theories of nuisance, trespass, and strict liability. The Iowa Code defines nuisance as follows:

Whatever is injurious to health, indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable use and enjoyment of life or property,

**27.** Some courts have determined that petroleum discharged through leaks and spills into soil meets the definition of discarded material, and thus constitutes solid waste. *Craig Lyle Ltd. Partnership v. Land O'Lakes, Inc.*, 877 F.Supp. 476, 481 (D.Minn.1995); *Zands v. Nelson*, 779 F.Supp. 1254, 1264 (S.D.Cal.1991). These cases, however, are inapposite to the instant case because the alleged violators in *Craig Lyle* and *Zands* were not subject to abatement and remediation conditions established under an NPDES permit.

**28.** Because of its holding, the Court need not address Williams' assertion that it is not a hazardous waste disposal facility.

**29.** Alternatively, the Court holds that Bayer does not have standing to bring the claim relating to seepage from the swamp, in view of the Court's findings that the swamp is not hydrologically connected to Bayer's property, and that any contamination that has reached the Des Moines River from groundwater carrying seepage from the swamp has not contaminated Williams' property. *See Defenders of Wildlife*, 851 F.2d at 1038–39; *see generally Blue Chip*, 528 N.W.2d at 626 (holding that without any evidence quantifying extent of fuel beneath above-ground tanks, it cannot be assumed that amounts of spillage posed threat to groundwater, where only evidence was photographs showing stained area beneath tanks).

is a nuisance, and a civil action by ordinary proceedings may be brought to enjoin and abate the same and to recover damages sustained on account thereof.

Iowa Code § 657.1 (1995).

■■■■ The statutory definition of nuisance does not modify the common-law rules regarding nuisance. *Weinhold v. Wolff*, 555 N.W.2d 454, 459 (Iowa 1996); *Mel Foster Co. Prop. v. American Oil Co.*, 427 N.W.2d 171, 173 (Iowa 1988). A private nuisance is "an actionable interference with a person's interest in the private use and enjoyment of the person's land." *Weinhold*, 555 N.W.2d at 459. A party's use of property "should not unreasonably interfere with or disturb a neighbor's comfortable and reasonable use and enjoyment of his or her estate." *Page Co. Appliance Ctr. v. Honeywell, Inc.*, 347 N.W.2d 171, 175 (Iowa 1984). Whether a party has created and maintained a nuisance is usually a factual question. *Weinhold*, 555 N.W.2d at 459.

■■■■ Whether operation of a lawful business is a nuisance depends on several factors, including the reasonableness of conducting the business in the manner, at the place, and under the circumstances in question. *Weinhold*, 555 N.W.2d at 459; *Page Co. Appliance Ctr.*, 347 N.W.2d at 175. Additional factors include priority of location, character of the neighborhood, and the nature of the alleged wrong. *Weinhold*, 555 N.W.2d at 459; *Page Co. Appliance Ctr.*, 347 N.W.2d at 181–82. The "character and gravity of the resulting injury" is a major factor in determining reasonableness. *Page Co. Appliance Ctr.*, 347 N.W.2d at 182. A factfinder balances the utility and meritoriousness of the defendant's conduct against the gravity of the wrong. *Id.* Chemical contamination of land, such as underground gasoline, can qualify as a nuisance. *See Mel Foster*, 427 N.W.2d at 173–75.

Williams does not deny the existence of contamination on Bayer's property, or that the contamination entered Bayer's property from groundwater flowing from Williams' site. Williams asserts, however, that no nuisance existed because Williams' contamination of a limited portion of Bayer's land did not interfere with Bayer's use or enjoyment

of its land. Williams notes that Bayer uses the property solely to receive income from the lease it entered into with Diamond Animal, and that the contamination has not interfered with Bayer's ability to lease the land.

Bayer's claim, however, is that the contamination interferes with its ability to sell the property, which it tried to do before having to revert to a plan for leasing the facilities. Bayer's evidence showed the existence of contamination on its property lowered the property value. The Court finds the value of Bayer's property has declined due to its contamination.

Williams argues, "Priority of occupation and location—'who was there first'—is a circumstance of considerable weight" in determining the existence of a nuisance. (Williams Tr. Br. at 45 (citations omitted)). Williams contends Miles became aware of the contamination on its property no later than 1992.

Here, Mobay was a subsidiary of Bayer when it bought Diamond Scientific from Agrion in February 1989. Williams does not allege Mobay should have known of the contamination when it bought Diamond Scientific. It was not until 1990 that Williams asked for permission to install monitoring wells on Mobay's property.

The Court holds that although Williams occupied its present site before Mobay purchased Diamond Scientific, Mobay neither knew nor should have known the extent of contamination on its property at the time of purchase. Under these circumstances, priority of occupation and location, while one factor the Court considers, does not by itself carry enough weight to mandate a finding that no nuisance exists.

■■■■ Considering all the circumstances and balancing Williams' conduct against the gravity of the wrong, including the decrease in the property value of Bayer's site, the Court holds that Williams is liable to Bayer for creating a nuisance. Because of the Court's holding, it need not determine the merits of Bayer's remaining state tort claims, which would only duplicate recovery.

### E. Damages

Because the Court found Bayer proved the tort of nuisance, it next must fashion appropriate relief Bayer seeks money damages including the following: the cost of remediation of Bayer's property to a level as if it had never been contaminated, the cost of the lost sale of Bayer's property in 1993, the value of the lost use of funds from the lost sale, and the cost of investigation of the contamination already incurred by Bayer. Bayer also seeks injunctive relief Specifically, Bayer wants Williams to take steps necessary to insure no further contamination flows from its property to Bayer's land. Williams requests the Court, if it awards any relief, to order Williams to remediate the property using the AS/SVE system it originally proposed to Bayer as part of its plan submitted to the DNR.

#### 1. Nature of Damages

If a nuisance causes damages that will be present for an indefinite but significant period, a court should consider the nuisance permanent. *Mel Foster*, 427 N.W.2d at 174. If injuries from a nuisance are permanent in character, a plaintiff is entitled to recovery in only one action. *Weinhold*, 555 N.W.2d at 462. All past, present, and future damages are recoverable in the one action, and the plaintiff cannot obtain a second recovery for continuance of the nuisance. *Id.* "[I]n such a case, one recovery is a grant or license to continue the nuisance, and there can be no second recovery for its continuance." *Id.*

Courts have applied the framework of permanent nuisances where the court deems it inequitable to order the thing that causes the injury removed, although it is removable. *Id.* at 463 (applying rule applicable to permanent nuisances to damages caused by commercial hog feeding and confinement facility; determining such closure would be inequitable and impractical).

Where the injury from the nuisance is temporary or recurring, a court usually regards the damages as continuing. *Id.* at 462. In case of a temporary nuisance, damages may be recovered periodically until the nuisance is abated. *Id.* at 463. Permanent damages may be awarded even if the nuisance is deemed temporary. *Id.; Mel Foster*, 427 N.W.2d at 175.

Williams contends no permanent damages should be allowed because the contamination to Bayer's property is only temporary, not permanent; AS/SVE technology makes possible a permanent and cost-effective remedy to the contamination.

Mere speculation that technology will eventually abate a nuisance is insufficient evidence to support a determination that the nuisance is temporary. *See Weinhold*, 555 N.W.2d at 463. The terms "permanent" and "temporary," are "somewhat nebulous in that they have practical meaning only in relation to particular fact situations and can change in characterization from one set of facts to another." *Id.* at 463 (citations omitted). Chemical contamination of land, such as by gasoline, encompasses aspects of both a temporary and permanent nuisance. *Mel Foster*, 427 N.W.2d at 175 (citations omitted).

Here, the contamination of Bayer's property is likely to continue for an indefinite but significant period. Expert testimony indicated that while AS/SVE technology is generally effective in remediating contamination, the effectiveness of an AS/SVE system on a particular site depends on many factors, including amount of equipment and pollution, and soil and groundwater conditions. The time required to clean up the Bayer site using Williams' proposed AS/SVE system is uncertain. The Court finds the damage in this case is more akin to permanent than to temporary damage. For this reason, and because it would be inequitable and impractical to order closure of Williams' facility or installation of a slurry wall, the Court will apply the rule applicable to permanent damages.

#### 2. Measure of Damages

When a nuisance results in contamination of property for an indefinite period of time, a proper measure of damages is diminution of the property's market value. *Mel Foster*, 427 N.W.2d at 175 (concluding proper measure of damages in nuisance case involving underground gasoline contamination was

difference between market value of property immediately before contamination and market value after contamination); *accord Weinhold*, 555 N.W.2d at 462.

Where a nuisance is permanent, the landowner may also recover special damages, including injuries to buildings, inconvenience, annoyance, and discomfort. *Id.* at 465. Special damages cannot be measured exactly, but they must be supported by evidence. *Id.* at 465.

Finally, a court may order injunctive relief in the case of a permanent nuisance, including relief relating to the manner of operating a facility. *Helmkamp v. Clark Ready Mix Co.*, 214 N.W.2d 126, 130 (Iowa 1974).

#### a. Diminution of Market Value

Williams' valuation expert, James Hayes, Jr., testified that in his opinion the diminution in market value to the Bayer land caused by the contamination is $275,000. See Ex. 67 at 4. This figure reflects the property's continued use as a licensed animal pharmaceutical facility, and the fact that the environmental contamination does not affect its use as such. The Court finds that Hayes' opinion most accurately reflects the factors affecting market value of this parcel. Based on Hayes' testimony and report, and the facts established in the record, the Court finds the award for diminution in market value to the Bayer property is $275,000.

#### b. Special Damages

Bayer seeks special damages, including the cost of remediation of Bayer's property to a level as if it had never been contaminated, the cost of the lost sale of Bayer's property in 1993, the value of the lost use of funds from the lost sale, and the cost of investigation of the contamination already incurred by Bayer.

Bayer has provided no evidence showing solely the cost of investigation of the contamination. The Court therefore has no basis for awarding special damages for such costs.

As for the remaining special damages sought by Bayer, the Court finds the damages awarded for diminution of market value provide Bayer with an adequate remedy to encompass those losses. Remediation will occur pursuant to DNR direction, and no further monetary award is required.

#### c. Injunctive Relief

Bayer also seeks injunctive relief in the form of requiring Williams to take steps necessary to insure no further contamination flows from its property to Bayer's land. Bayer requests the Court to order Williams to install an underground slurry wall, at a cost of approximately $1.7 to $3 million, to prevent migration of contamination to its site from the Williams site.

The appropriateness of an injunction in a tort case depends on a comparison of all factors, including the following main factors:

(a) the character of the interest to be protected,

(b) the relative adequacy to the plaintiff of injunction and of other remedies,

(c) plaintiff's delay in bringing suit,

(d) plaintiff's misconduct,

(e) the relative hardship likely to result to defendant if injunction is granted and to plaintiff if it is denied,

(f) the interests of third persons and of the public, and

(g) the practicability of framing and enforcing the order or judgment.

*Weinhold*, 555 N.W.2d at 466–67; *Helmkamp*, 214 N.W.2d at 130. "The decision is a judgment call." *Weinhold*, 555 N.W.2d at 466–67.

For abatement, it would be impractical and unreasonably expensive for Williams to build an underground wall. The evidence indicates that Williams' present system on its site attempts to remediate and abate the nuisance. Additionally, there is ongoing discussion with DNR as to the plan for the Bayer site. The Court has already awarded damages to Bayer for diminution of market value, and finds such damages provide Bayer with an adequate remedy. Upon consideration of the evidence and the factors quoted above, the Court believes Bayer should not

be granted the injunction it seeks relating to abatement.

### F. Claim for Declaratory Relief

Williams seeks relief under the Declaratory Judgments Act, 28 U.S.C. § 2201 (1994). Williams' claim for declaratory judgment allowing it access to Bayer's land to install equipment for remediation is premised on an asserted implied right stemming from Bayer's CWA citizen suit claims. Williams argues that if it is not granted an easement giving it access to Bayer's property to remediate, then DNR will initiate remediation and sue Williams to recover reasonable cleanup costs under Iowa Code §§ 455B.387 [30] and 455B.392.[31]

█ Under the Declaratory Judgment Act, a federal court has the power to give a declaratory judgment "in cases of actual controversy within its jurisdiction." *Rueth,* 13 F.3d at 231, 28 U.S.C. § 2201. The Act is not an independent grant of jurisdiction; jurisdiction must rest on some other statute. *Rueth,* 13 F.3d at 231. Because the Court has no jurisdiction over Bayer's CWA claims, it cannot grant a declaratory judgment. *See id.* (declining to grant declaratory judgment after determining court lacked jurisdiction under CWA to review EPA's pre-enforcement actions). The Court denies Williams' claim for a declaratory judgment under 28 U.S.C. § 2201.

If the Court had found in favor of Bayer on its claim under Iowa Code Chapter 455B, it would not give Williams an easement in Bayer's land. To support its argument, the only case Williams cites is *Blue Chip,* in which the court held that under 455B.392, a state can compel initial payment of cleanup costs rather than seek recoupment of costs already incurred. *Blue Chip,* 528 N.W.2d at 625; *see* Iowa Code § 455B.392. *Blue Chip,* however, did not address the issue facing this Court: whether, in a declaratory judgment action, a plaintiff can obtain an easement in another's land, where the plaintiff will have an opportunity to exhaust its administrative remedies, but has not yet done so.

Iowa Code § 17A.19 [32] contains the exclusive means of judicial review of agency action after a party has exhausted its administrative remedies, and the statute precludes judicial review by common-law writs such as declaratory judgment, certiorari, and injunction. *Salsbury Lab. v. Iowa Dep't of Envtl. Quality,* 276 N.W.2d 830, 833–34 (Iowa 1979) (granting motion to dismiss corporation's petition seeking certiorari, declaratory and injunctive relief from Department's order); *accord IES Utilities, Inc. v. Iowa Dep't of Revenue and Finance,* 545 N.W.2d 536, 539 (Iowa 1996) (affirming dismissal of utilities' petition for declaratory judgment that Department of Revenue failed to follow statutory rulemaking procedures; utilities were not

---

**30.** Section 455B.387 provides as follows:

1. When any hazardous condition exists, the director may remove or provide for the removal and disposal of the hazardous substance ... unless the director determines such removal will be properly and promptly accomplished by the owner or operator of the vessel, vehicle, container, pipeline or other facility.
2. The director may use any resources available under the hazardous condition contingency plan to provide for the removal of hazardous substances. If the director finds that public agencies cannot provide the necessary labor or equipment or if the director determines that emergency conditions exist, the director may contract with a private person or agency for removal of the hazardous substance.
Iowa Code 455B.387(1), (2) (1995).

**31.** Section 455B.392 provides in pertinent part as follows:

1. A person having control over a hazardous substance is strictly liable to the state for all of the following:
a. The reasonable cleanup costs incurred by the state or its political subdivisions, by governmental subdivisions, or by any other persons participating in the prevention or mitigation of damages with the approval of the director, as a result of the failure of the person to clean up a hazardous substance involved in a hazardous condition caused by that person.
Iowa Code 455B.392(1)(a) (1995).

**32.** Iowa Code § 17A.19 states in part as follows:
Except as expressly provided otherwise by another statute referring to this chapter by name, the judicial review provisions of this chapter shall be the exclusive means by which a person or party who is aggrieved or adversely affected by agency action may seek judicial review of such agency action.
Iowa Code § 17A.19 (1995).

excused from exhausting their administrative remedies before seeking judicial review); *Tindal v. Norman,* 427 N.W.2d 871, 873 (Iowa 1988).

 A party seeking a declaratory judgment and avoiding going through usual chapter 17A and judicial-review-of-final-agency action steps bears the burden of demonstrating why it should be permitted to enter court prematurely. *IES Utilities,* 545 N.W.2d at 539; *Salsbury,* 276 N.W.2d at 836. The exhaustion requirement may be bypassed under the following limited circumstances: where a plaintiff challenges an agency action as being in violation of rule-making procedures under the IAPA; where a plaintiff claims no adequate administrative remedy exists for the claimed wrong, i.e., the plaintiff will suffer "irreparable injury of substantial dimension" if not allowed access to a district court before exhausting available administrative remedies; or the plaintiff asserts the applicable statute does not require exhaustion of remedies before bringing the action in court. *IES Utilities,* 545 N.W.2d at 539 (quoting *Salsbury,* 276 N.W.2d at 837).

 If and when DNR orders Williams to pay cleanup costs, Williams can appeal for administrative review under Iowa Code § 455B.392(1)(d) [33]. Until then, Williams has not exhausted its administrative remedies and is precluded from seeking relief in federal court. *See Pruess Elevator, Inc. v. Iowa Dep't of Natural Resources,* 477 N.W.2d 675, 677 (Iowa 1991) (dismissing elevator owner's request for judicial review of DNR's order and for ruling that owner not be held liable for costs of removing contaminated corn, where DNR had not yet made claim for removal costs and owner had failed to exhaust administrative remedies; remedies existed for resolving liability for removal costs under Iowa Code § 455B.392(d)); *cf Cota v. Iowa Envtl. Protection Comm'n,* 490 N.W.2d 549, 550 (Iowa 1992) (dismissing petition for judicial review of DNR's emergency order to fence contaminated area, where petitioner had not exhausted his administrative reme-

dies by seeking a stay or otherwise challenging the order).

Williams has not asserted it will suffer irreparable injury of substantial dimension if it is not allowed to seek a court remedy at this juncture. The company has offered no evidence beyond mere speculation that the state will initiate remediation on Bayer's property and sue Williams to recover cleanup costs, and that the "reasonable cleanup costs" incurred by the state will exceed the amount Williams estimates it proposed to spend on installing and monitoring AS/SVE equipment on Bayer's property. Williams has not met its burden of demonstrating why it should be permitted to enter court before exhausting administrative remedies.

 Finally, the Court's holding that Williams is liable for nuisance provides Williams no implied right to an easement on Bayer's land. See *Woody v. Machin,* 380 N.W.2d 727, 731 (Iowa 1986) (holding court lacked authority to give defendants easement in plaintiffs' land to construct and maintain tile line to abate nuisance).

The Court denies Williams' claim for a declaratory judgment due to lack of jurisdiction.

### G. Motion to Re-open Discovery

Bayer filed a Motion to Re-open Discovery and for Additional Time to File a Motion to Re-open Evidence (Clerk's No. 73) on April 10, 1997. The motion was based on an alleged spill or release of approximately 1,250,000 gallons of petroleum on the Williams property. Bayer seeks additional discovery to determine the nature, history and extent of the spill or release to determine if there is a reason for the record to be re-opened. Bayer argues the existence of the spill counters Williams' claims at trial that large scale releases or spills will no longer happen on Williams' land and pose no continuing threat to Bayer. Bayer asserts an investigation of the causes and detection of the spill may lead to new evidence regarding the likelihood of

---

**33.** Iowa Code § 455B.392(1)(d) states in part as follows:

Claims by the state under this subsection [liability for cleanup costs] may be appealed to the

commission by the person filing a written notice of appeal within thirty days after receipt of the bill.

Iowa Code § 455B.391(d) (1995).

further contamination of Bayer's property and the "operation systems for or control and management of petroleum products," by Williams, including the cause of the recent spill.

The Court holds the additional evidence Bayer seeks would be irrelevant for two reasons. First, in view of the Court's finding that the nuisance created by Williams is permanent, the issue of the likelihood of further contamination of Bayer's property is moot. Second, evidence gathered concerning the Williams' "operation systems for or control and management of petroleum products," including the causes of the spill or release, pertains to Bayer's negligence claim. As already noted, the Court need not determine the merits of Bayer's remaining state tort claims, because the Court has already found Williams is liable for nuisance, and any additional award would only duplicate recovery.

For these reasons, the Court denies Bayer's Motion to Re-open Discovery and for Additional Time to File a Motion to Re-open Evidence.

### III. CONCLUSION

In summary, the Court concludes as follows: The Court does not have jurisdiction over Williams' claim for declaratory judgment; nor does the Court have jurisdiction over Bayer's counterclaims under the Clean Water Act, the Resource Conservation and Recovery Act, or Iowa Code § 455B. 186. These claims are dismissed. Bayer has proved its claim of permanent nuisance; the Court awards Bayer $275,000 for the diminution in market value of its land due to the environmental contamination. The Clerk is directed to enter judgment accordingly. Bayer's claims for any special damages, injunctive relief, and attorneys fees are denied. Bayer's Motion to Re-open Discovery and for Additional Time to File a Motion to Re-open Evidence is denied.

**IT IS SO ORDERED.**